COMMONWEALTH of Pennsylvania,
Appellee

v.

Brandon Denzel CHARLESTON,
Appellant.

Superior Court of Pennsylvania.

Argued Dec. 7, 2010.

Filed Feb. 18, 2011.

Reargument Denied April 14, 2011.

506

Jules Epstein, Philadelphia, for appellant.

Hugh J. Burns, Jr., Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: BENDER, OLSON and OTT, JJ.

OPINION BY BENDER, J.:

Brandon Denzel Charleston (Appellant) appeals from the judgment of sentence entered following his convictions for first-degree murder and possession of an instrument of crime. Appellant claims that the trial court erred in denying his motion to suppress and in permitting the Commonwealth to introduce certain inculpatory evidence. For the reasons that follow, we affirm.

The evidence adduced at trial showed that Appellant shot and killed William Stanton (the victim). Appellant claimed, in a statement to the police and at trial, that he acted in self defense. The Commonwealth charged Appellant with first-degree murder and possession of an instrument of crime. Following a jury trial, Appellant was found guilty and sentenced to life imprisonment and a concurrent term of three to twenty four months for possession of an instrument of crime.

The trial court set forth the following detailed account of the trial testimony:

Tracey Leslie testified that since the year 2000, he has lived at 2428 North 25th Street with his brother Travis Leslie and his stepbrother Kevin Watson. Tracey Leslie testified that he knew William Stanton, the [victim], and [the victim]'s mother, Clara Stanton, from his neighborhood on North 25th Street. Mr. Leslie testified that he was familiar with Appellant as [o]ne of the young guys in the neighborhood. Mr. Leslie testified that Appellant was never invited into Mr. Leslie's home. Mr. Leslie testified that he did not know the [victim] to carry a gun.

Mr. Leslie testified that on Saturday, June 14, 2008, the neighborhood of [the] 2400 block of North 25th Street held a block party, at which [the victim] and Appellant were present. Mr. Leslie left the block party at 9:30 p.m. and went to his girlfriend's home.... The last time Mr. Leslie saw [the victim] was 9:30 p.m. on June 14, 2008.

Mr. Leslie testified that he received a call from his brother, Travis Leslie, at approximately 3:00 p.m. on Sunday, June 15, 2008. Travis Leslie informed Mr. Leslie that something occurred at his home and that he should return. Mr. Leslie testified that two minutes later he returned to 2428 North 25th Street to find [the victim lying] on the floor.

. . .

David Taylor testified that he has lived at 2422 North 25th Street for ten years and knew [the victim] and his mother Clara Stanton as his neighbors. Mr. Taylor testified that he never knew [the victim] to carry a gun. Mr. Taylor stated that he was familiar with Appellant, Travis Leslie, Tracey Leslie, and Kevin Watson because they lived in the same neighborhood.

Mr. Taylor testified that on the morning of Sunday, June 15, 2008, he was standing outside of his home on North 25th Street and heard four gunshots fired. Mr. Taylor stated that he remembered seeing a man named Gary Outlaw standing at the corner of 25th and Hagart on Mr. Taylor's side of the block. Mr. Taylor testified that after the shots were fired, Mr. Outlaw entered his car and drove away. About thirty seconds later, Mr. Taylor observed Appellant exit 2428 North 25th Street in a casual jog. . . .

The brother of Tracey Leslie, Travis Leslie, testified that he lived at 2428 North 25th Street with his brothers, Kevin Watson and Tracey Leslie, and that he has known the [victim], Clara Stanton and [Appellant] from the neighborhood on North 25th Street. Travis Leslie stated that he never invited [Appellant] into his home for any purpose.... Travis Leslie observed Mr. Outlaw outside of 2428 North 25th Street at approximately 11:30 a.m. when he left his home.

. . .

Mr. Watson, Travis Leslie and Tracey Leslie went to the Homicide Unit of the Philadelphia Police Department to give a statement. As Travis Leslie returned home he observed the Appellant walking from the direction of Hagert Street. Travis Leslie approached the Appellant and asked, Do you know anything that happened at the house? and the Appellant stated that he was not at the Leslie's home. Then, according to Travis Leslie, the Appellant stated that I know something, I don't know something.

. . .

Nashua Sanders testified that she was familiar with the neighborhood of 25th and Hagert Street in 2008.... Ms. Sanders testified that she knew the next door neighbors Clara Stanton and the [victim], as well as Kevin Watson, Tracey and Travis Leslie, and David Taylor. Ms. Sanders testified that she knew the Appellant and considered each other to be close friends. **Ms. Sanders testified that she never had a conversation with Ms. Stanton in which she disclosed a conversation with the Appellant a week before regarding Appellant's plan to rob the [victim]. On cross-examination, Ms. Sanders testified that Appellant never made any** **comments to her about a plan to physically harm the [victim].**

Ms. Stanton testified that she knew Ms. Sanders, Ms. Star Nelson and Ms. Sabrea Nelson from the neighborhood on North 25th Street. On cross-examination, Ms. Stanton testified that she knew Appellant for a number of years. According to Ms. Stanton, Appellant visited her home every morning to meet her son, [the victim].... After the shooting of June 15, 2008, Ms. Stanton did not see Appellant in the neighborhood again. Ms. Stanton testified that she received information from her neighbors that Appellant was responsible for her son's death; however, Ms. Stanton did know how the neighbors acquired such information.... Ms. Stanton testified on re-direct that she had a conversation with her neighbor, Ms. Sanders, approximately three weeks after the shooting death of her son on June 15, 2008. **Ms. Stanton stated that Ms. Sanders informed her of a conversation between Ms. Sanders and Appellant that took place approximately a week before the shooting death of her son. Ms. Stanton testified that Ms. Sanders informed her that, during the conversation between Ms. Sanders and the Appellant, the Appellant told her that he was going to rob [the victim] a week ahead of time.**

. . .

Philadelphia Homicide Detective Nathan Williams testified that he was assigned to investigate the shooting death of Mr. William Stanton inside the home [at] 2428 North 25th Street. Detective Williams collected fired cartridge casings and other ballistics evidence to assist in processing the scene. Detective Williams interviewed all of the occupants of the home, including Tracey Leslie, Travis Leslie and Kevin Watson. Detective Williams also interviewed neigh-

bors and possible witnesses, including [the victim]'s girlfriend, Ms. Anderson, Ms. Stanton, Eric Brinkley, Gary Outlaw and David Taylor. Detective Williams testified that one of the Leslie brothers contacted Homicide Detectives at or around 11:33 p.m. on June 15, 2008 and indicated that [Appellant] may have been involved in the shooting. Detective Williams directed other detectives to locate and interview Mr. Outlaw.

. . .

From the cell phone collected from the [victim] at Temple University Hospital, Detective Williams compiled a list of the [victim]'s last calls, including missed, outgoing and incoming calls. Detective Williams testified that the [victim]'s phone included a contact name entry for "Brandon" which corresponded with (267) 707–3704 and programmed into the [victim]'s phone as "We 1." Detective Williams stated that he discovered, through subscriber information, that the telephone number for "Brandon" was that of Gina Muldrow, the mother of Appellant, of 2428 West Hagert Street, Philadelphia, PA. Detective Williams testified that the last incoming phone call on June 15, 2008, received by the cell phone of the [victim], was from "We 1" and lasted one minute. . . .

Philadelphia Police Officer Anthony R. Soliman testified that on July 16, 2008, he was on patrol with Philadelphia Police Officer Anthony Mooney investigating gang issues near the 22nd and 39th police districts. Officer Soliman testified that at approximately 9:10 p.m. he received information via police radio describing a homicide suspect as a black male wearing dark shorts, a black shirt, and head towel on the corner of 25th and Hagert Streets. When Officer Soliman approached the corner of 25th and Hagert Streets, he observed a black male matching the radio description.

The male walked up a flight of steps and entered a house at 2432 North 25th Street.

Officer Soliman stated that he approached the home at 2432 North 25th Street, knocked on the door and the Appellant answered. Officer Soliman testified that he informed the Appellant that he was not under arrest, but that they were investigating a crime. . . .

Before the officers left the [home at] 2432 North 25th Street, a woman identified as Clara Stanton approached the officers' vehicle. Officer Soliman testified that Ms. Stanton informed the officers that . . . Appellant . . . was the person who killed her son. Officer Soliman testified that when asked how Ms. Stanton knew that information, she stated, "everybody knows that information, just nobody wants to come forward with that." Officer Soliman contacted homicide detectives and informed the detectives of the identity of the Appellant. Homicide Detectives directed the officers to bring the Appellant into the Homicide Unit.

At police headquarters, Philadelphia Homicide Detective Greg Singleton interviewed the Appellant at 10:00 a.m. on July 17, 2008, [which was the following day]. Detective Singleton testified that on the day of the shooting, he observed the Appellant across the street from the shooting scene at 2428 North 25th Street speaking with a group of males. Detective Singleton testified that, on the evening of Appellant's arrival to police headquarters, [on July 16th,] the Appellant appeared to be under the influence of alcohol because he was off balance, his eyes were bloodshot and his speech was slurred. Detective Singleton testified that the Appellant was informed of his constitutional right to an attorney and declined to request an attorney pri-

or to being interviewed. Detective Singleton interviewed the Appellant regarding the shooting death of [the victim] on June 15, 2008 and recorded the interview in writing. Detective Singleton read the following into evidence:

Q. Did you shoot William Stanton inside of 2428 North 25th Street on 6-15-08?

A. Yes.

Q. Can you tell me in your own words what happened inside of 2428 North 15th Street[?]

A. We were both standing in front of William's door. And we were talking about Xanies. Then we went into the house on the corner. When we went into the house, he said he didn't have them. He said, I thought you had them. And then it became a dispute because [we] were both high and we started arguing.

Then he pulled out the gun and I started wrestling with him, the gun went off about three times. I took the gun and left the house and threw it in the sewer right on the corner of 25th Street. As soon as you come out the house, it's a sewer right there. That's were I put it.

. . .

Q. Can you describe the gun that you threw into the sewer?

A. It was a .45 ACP, I think.

. . .

Q. So when you went into the house with William talking about the Xanies, were you going to buy some Xanies from Will?

A. Yes.

Q. Did William give you the Xanies before the shooting?

A. No. Because we had a dispute about the drugs. I wanted a deal on the Xanies. I wanted to see if I could

get six Xanies for $20. He wasn't trying to hear it. I told him that I would have did it for him. Then we started arguing and we both were already high. That's when the gun came into play. ·

(N.T. 8–21–2009, at p. 162–165).

Detective Singleton testified that during the interview the Appellant stated that the only person who knew about the shooting was his mother. The Appellant stated that he acted out of self defense.

Q. Is there anything you wish to add to your statement?

A. It was self defense. It's not like I pointed it at him and shot him or nothing like that.

(N.T., 8–21–04, at p. 168) Detective Singleton testified that he returned to the crime scene with the Water Department to determine whether a firearm could be found in the drain system. Detective Singleton testified that he was told by the crew chief, Frank McConnell, that the Water Department cleaned the drains two weeks prior and no firearms were retrieved from the sewer.

Philadelphia Police Officer Michael Maresca of the Crime Scene Unit testified that he collected fired cartridge casings and other ballistics evidence to assist in processing the shooting scene at 2428 North 25th Street. Officer Maresca collected two .45 fired cartridge casings and one .45 caliber projective bullet from the dining room. Officer Maresca also recovered one live round found on the living room couch, next to the cushion area.

. . .

Philadelphia Police Officer Louis Grandizio of the Firearms Investigation Unit testified as an expert in tool markings, firearms identification and ballistics. Officer Grandizio testified that all

of the fired cartridge casings were .45 [caliber] and manufactured by CBC, a Brazilian cartridge company.... Officer Grandizio testified that, hypothetically, if two people were tussling over a gun with both hands on the handgun, then, it would be highly unlikely that the firearm would not jam due to the obstruction of the slide. Officer Grandizio stated that, in the event a person's hand obstructed the slide, it would be unlikely that the firearm would fire three times and more likely that it would fire one time and, then, become jammed.

At trial, the Appellant testified on his own behalf. The Appellant described the shooting inside the home at 2428 North 25th Street:

APPELLANT: Yeah, we were both high. We both were you know, high off of pills, you know, we both were.

MR. INGRAM: Now, the gun that you said that he pulled, had you seen that gun before?

APPELLANT: I seen—I see him with it, you know. I don't play with guns, so I don't even associate with guns. The people that I hang around don't even carry—don't carry guns.

MR. INGRAM: And when he pulled the gun, where did he get the gun from?

APPELLANT: He got it from his waistline, you know, he always have it, you know.

MR. INGRAM: And when the gun is pulled, what direction is the gun pointed?

APPELLANT: It's pointed in my face, that's where it's pointed. It's pointed directly in my face.

. . .

MR. INGRAM: So you thought he was going to kill you?

APPELLANT: Yes.

. . .

MR. INGRAM: And what happened next?

APPELLANT: Well, he grabbed my glasses. And then when he grabbed my glasses, you know, now I grabbed his arm. You know, now we're wrestling with the gun, you know. We're wrestling. I'm moving his arm and we're wrestling now.

MR. INGRAM: And when you're wrestling, are you holding the arm that had the gun?

APPELLANT: Yes, yes.

MR. INGRAM: And what happens next as you're wrestling with the gun?

APPELLANT: You know, while we're wrestling with the gun, you know, we're wrestling probably 30 seconds, maybe if that, and then the gun goes off, you know, it went off and you know, fast. You know, pow, pow, pow. It wasn't drawn out like, you know, it happened and then it happened and happened. It happened all at once. It happened all at once.

MR. INGRAM: And after you hear the gun go off, what happens to Will and what happens to you?

APPELLANT: You know, we falls. We falls, you know. And I'm in shock, you know, because I'm high. We're both high. So by me being high it's like, you know, what's going on? Now it's, you know, it's like what's going on now.

MR. INGRAM: Okay. And when he fell, do you recall how he fell?

APPELLANT: He fell on his stomach. He fell face first, I guess, on his stomach.

(N.T. 8–24–2009, at p. 40–43).

On cross examination, the Appellant stated that ... he removed the gun from [the victim]'s hand, exited the

house and placed the firearm in the sewer. The Appellant testified that he never called 911 for medical assistance.

Trial Court Opinion (T.C.O.), 5/27/10, at 1–18 (citations and quotation marks omitted) (emphasis added).

On appeal, Appellant presents the following three questions for our review:

1. Did not the lower court err in denying the motion to suppress statements, as the statements were the fruit of an unlawful seizure and, separately, the second statement was obtained in violation of *Miranda* as developed in *Missouri v. Seibert*, 542 U.S. 600 [124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) ]?

2. Did not the lower court err in admitting double hearsay, admissible under no exception, for the truth of the matter asserted?

3. Did not the lower court err in its other evidentiary rulings, in particular, the admission of evidence of Appellant's tattoos, the admission of hearsay evidence, and the exclusion of proof supportive of the claim of self-defense?

Brief for Appellant at 5.

In the first question presented for our review, Appellant challenges the trial court's denial of his motion to suppress his statement to Detective Singleton. Our standard for reviewing an order denying a motion to suppress is as follows:

We are limited to determining whether the lower court's factual findings are supported by the record and whether the legal conclusions drawn therefrom are correct. We may consider the evidence of the witnesses offered by the Commonwealth, as verdict winner, and only so much of the evidence presented by defense that is not contradicted when examined in the context of the record as a whole. We are bound by facts supported by the record and may reverse only if the legal conclusions reached by the court were erroneous.

*Commonwealth v. Hughes*, 908 A.2d 924, 927 (Pa.Super.2006).

Appellant advances two independent bases for suppressing his statement. First, he claims a violation of the Fourth Amendment to the U.S. Constitution based upon his seizure that allegedly was not supported by either reasonable suspicion or probable cause. Second, he claims that the failure to provide him with *Miranda* warnings violated his Fifth Amendment right against self-incrimination. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

In regards to Appellant's Fourth Amendment claim, he argues that "at each step of increasing police intervention, there was an absence of either reasonable suspicion or probable cause, making the seizure unreasonable." Brief for Appellant at 13. As a result of this alleged Fourth Amendment violation, Appellant claims that his subsequent statement implicating himself in the shooting, even though given after *Miranda* warnings, should have been suppressed because it was tainted by the initial illegality of his seizure or arrest. *See Wong Sun v. U.S.*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (applying the exclusionary rule to inculpatory statements procured in connection with an illegal seizure unless the statement was arrived at by "means sufficiently distinguishable" from the initial illegality so as to be "purged of the primary taint"); *Brown v. Illinois*, 422 U.S. 590, 602–03, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (holding that an inculpatory statement given as a result of a Fourth Amendment violation such as an unconstitutional arrest is excludable even if the defendant subsequently receives his *Mi-*

**514** ▪ ▬▬▬▬▬▬▬▬▬▬▬▬

*randa* warnings, unless the prosecution can show that the circumstances "make the [statement] sufficiently a product of free will [to] break, for Fourth Amendment purposes, the causal connection between the illegality and the confession").

▪ We begin our analysis of Appellant's Fourth Amendment claim by setting forth the different levels of citizen-police interactions recognized in Fourth Amendment jurisprudence.

[I]n assessing the lawfulness of citizen/police encounters, a central, threshold issue is whether or not the citizen-subject has been seized. Instances of police questioning involving no seizure or detentive aspect (mere or consensual encounters) need not be supported by any level of suspicion in order to maintain validity. Valid citizen/police interactions which constitute seizures generally fall within two categories, distinguished according to the degree of restraint upon a citizen's liberty: the investigative detention or *Terry* stop, which subjects an individual to a stop and a period of detention but is not so coercive as to constitute the functional equivalent of an arrest; and a custodial detention or arrest, the more restrictive form of permissible encounters. To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person seized is engaged in criminal activity and may continue only so long as is necessary to confirm or dispel such suspicion; whereas, a custodial detention is legal only if based on probable cause. To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in view of all surrounding circumstances,

a reasonable person would have believed that he was free to leave. In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.

*Commonwealth v. Strickler*, 563 Pa. 47, 757 A.2d 884, 888–90 (2000) (footnotes and citations omitted). *See also Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Appellant initially claims that he was subjected to an investigatory detention that was not supported by reasonable suspicion. While Appellant filed a motion to suppress challenging the legality of his arrest and argued this point at the suppression hearing, at no point in either his motion to suppress or his argument at the hearing did Appellant argue that he was subjected to an investigative detention unsupported by reasonable suspicion. Motion to Suppress, 3/30/09; N.T., 8/17/09, at 3, 103–08. Accordingly, we find this particular claim waived due to Appellant's failure to preserve it. *See* Pa.R.A.P. 302(a) (stating, "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *Commonwealth v. Shamsud–Din*, 995 A.2d 1224, 1228 (Pa.Super.2010) (stating that "in order for a claim of error to be preserved for appellate review, a party must make a timely and specific objection before the trial court at the appropriate stage of the proceedings; the failure to do so will result in waiver of the issue") (quotation marks omitted).

▪ Next, we address Appellant's claim that he was subjected to an arrest

where probable cause was lacking. The resolution of this question requires that we first determine the point in time at which Appellant was subjected to a custodial detention or an arrest.

An encounter becomes an arrest when, under the totality of the circumstances, a police detention becomes so coercive that it functions as an arrest. The numerous factors used to determine whether a detention has become an arrest are the cause for the detention, the detention's length, the detention's location, whether the suspect was transported against his or her will, whether physical restraints were used, whether the police used or threatened force, and the character of the investigative methods used to confirm or dispel suspicions.

*Commonwealth v. Stevenson*, 894 A.2d 759, 770 (Pa.Super.2006) (citations omitted).

At the suppression hearing, Officer Soliman testified that upon encountering Appellant, he informed Appellant that there were a few questions that he would like to ask him. Officer Soliman then directed Appellant to the back seat of his police car where Appellant seated himself. N.T., 8/17/09, at 10. The windows for the back doors remained down and Appellant was not handcuffed. *Id.* at 11, 14–15. Although Officer Soliman had responded to a radio call of a murder suspect being at Appellant's location, Officer Soliman did not know the details of the crime in question. While Appellant was seated in the police car, Officer Soliman asked him his name, to which Appellant answered truthfully. Officer Soliman ran a check on Appellant's name and the results revealed no outstanding warrants.

While they were seated in the police car, the victim's mother approached and in-

formed Officer Soliman that Appellant had murdered her son. Officer Soliman followed up on this information by calling the homicide office at the police station to inquire into the victim's murder investigation and to ascertain whether Appellant was a suspect. During this time, Appellant remained seated in the backseat without handcuffs. Although Officer Soliman did not identify the particular detective he spoke with, he did receive an order to handcuff Appellant and transport him to jail. *Id.* at 14. Officer Soliman complied with this order. Under these circumstances, we conclude that whatever the nature of the interaction between Officer Soliman and Appellant while he was seated in the back of the police car, it did not evolve into a custodial detention until Officer Soliman handcuffed Appellant and transported him to jail.[1]

■ The facts known to Officer Soliman at this point were insufficient to establish probable cause to arrest Appellant for murder, as his only information consisted of that contained in the radio call and the allegations made by the victim's mother. However, since a homicide detective ordered Officer Soliman to arrest Appellant, we must also examine whether this order emanated from an officer who possessed sufficient information to establish probable cause. *See Commonwealth v. Rush*, 459 Pa. 23, 326 A.2d 340, 341 (1974) (stating that while "the facts and circumstances establishing probable cause must be known to the police at the time of the arrest, ... acting on the orders of an officer with probable cause obviates the need for probable cause on the part of the arresting officers"); *Commonwealth v. Fromal*, 392 Pa.Super. 100, 572 A.2d 711,

---

1. We note that Appellant does not claim that a custodial detention occurred at any point prior in time.

717 (1990) (stating, "An arresting officer is not required to have sufficient information to establish probable cause for the arrest so long as the officer ordering the arrest possessed sufficient information giving rise to probable cause.").

■ Detective Singleton, the detective who interviewed Appellant and obtained his inculpatory statement, testified at the suppression hearing that he was at the homicide office on July 16, 2008, at the time of Officer Soliman's call to the office. Approximately one week earlier, Detective Singleton had interviewed Gary Outlaw, who stated that he witnessed Appellant and the victim having a discussion immediately prior to the shooting. N.T., 8/17/09, at 49–50. In particular, Outlaw saw Appellant and the victim talking outside the residence where the shooting occurred and then witnessed them both enter the residence. *Id.* Shortly thereafter, he heard gunshots and left the scene. He also stated that Appellant called him that night and admitted to shooting the victim. *Id.* at 51. Therefore, the information that Detective Singleton possessed was well beyond the threshold necessary to establish probable cause to arrest Appellant on suspicion of murder.

Appellant acknowledges this, yet claims that the evidence introduced at the suppression hearing did not establish "that it was Singleton who ordered [A]ppellant to be brought in to homicide headquarters." Brief for Appellant at 14. The Commonwealth responds to this argument by directing us to Detective Singleton's testimony *at trial* where he testified that it was he who gave the order to arrest Appellant and bring him to the homicide office. N.T., 8/21/09, at 149–50. In his Reply Brief, Appellant argues that it is improper for us to consider evidence adduced at trial in analyzing the ruling of the suppression court. Reply Brief at 5–6. After review,

we conclude that the evidence adduced at the suppression hearing was sufficient to establish that Detective Singleton was the one who gave the order to arrest Appellant, and, *assuming arguendo,* that this fact was not established at the suppression hearing, it is proper for this Court to consider Detective Singleton's trial testimony in affirming the court's order denying Appellant's motion to suppress.

First, we consider Detective Singleton's testimony at the suppression hearing where he testified as follows:

Q. Now, just going back. When he was brought into Homicide, who was it that requested that he be brought to Homicide? Was it you or somebody else?

A. The call came into our office that officers had him stopped and I was asked by a detective is this somebody we're looking for and I said yes, we'll speak with him.

Q. Well, were you looking for him?

A. Yeah, I wanted to talk to him.

Q. Did you have a warrant for him?

A. No.

N.T., 8/17/09, at 80. While Detective Singleton did not testify that he actually gave an order, a reasonable implication of his testimony was that the order to arrest Appellant emanated from Detective Singleton.

■ This fact was also unequivocally established by Detective Singleton's testimony at trial, and the law of this Commonwealth is clear that we may consider such evidence. In *Commonwealth v. Douglass,* 701 A.2d 1376, 1378 (Pa.Super.1997), this Court stated, "When reviewing the trial court's ruling on a motion to suppress, we may consider the evidence presented both at the suppression hearing and at trial." *See also Commonwealth v. Chacko,* 500 Pa. 571, 459 A.2d 311, 317 n. 5 (1983)

(stating that "it is appropriate to consider *all* of the testimony, not just the testimony presented at the suppression hearing, in determining whether evidence was properly admitted"); *Commonwealth v. Carr*, 292 Pa.Super. 137, 436 A.2d 1189, 1191 (1981) (stating, "An appellate court should be able to consider all the testimony on record to determine whether certain evidence was constitutionally admissible at trial, not just the testimony at the suppression hearing.") (citation and quotation marks omitted).

In arguing that this Court is prohibited from considering evidence from trial when evaluating the ruling of a suppression court, Appellant cites a line of cases that are inapposite. The lead case on which he relies is *Commonwealth v. Monarch*, 510 Pa. 138, 507 A.2d 74 (1986), where the court held that the trial court erred when it granted a post-verdict motion on the basis of new testimony introduced at trial, which demonstrated that the evidence of the defendant's intoxication should have been suppressed. In *Monarch*, the defendant was convicted of DUI and prior to trial, he moved to suppress evidence of his intoxication on the basis of a police officer's allegedly illegal warrantless entry into the defendant's house. The trial court denied the motion to suppress. After the defendant was found guilty, he filed a post-verdict motion claiming that the trial court erred in denying his motion to suppress. The trial court granted the post-verdict motion and suppressed the evidence, thereby reversing its pre-trial ruling that held the evidence admissible. In so doing, the trial court reasoned that the new evidence introduced at trial demonstrated that the warrantless entry was illegal.

On appeal to our Supreme Court, the court considered the applicability of the former Pa.R.Crim.P. 323(j), now set forth at Pa.R.Crim.P. 581(J), which states:

If the court determines that the evidence shall not be suppressed, such determination shall be final, conclusive, and binding at trial, *except upon a showing of evidence which was theretofore unavailable,* but nothing herein shall prevent a defendant from opposing such evidence at trial upon any ground except its suppressibility.

Pa.R.Crim.P. 581(J) (emphasis added). The purpose of this rule is to allow the trial court to revisit its ruling on a motion to suppress on the basis of *new and previously unavailable evidence* introduced at trial that shows that the ruling on the motion to suppress was in error. The following excerpt from *Monarch* explains the rationale for this rule.

When information comes to light *after* the suppression hearing clearly demonstrating that the evidence sought to be introduced by the Commonwealth is constitutionally tainted, no consideration of justice or interest of sound judicial administration would be furthered by prohibiting the trial judge from ruling it inadmissible. Although a favorable ruling at the suppression hearing relieves the Commonwealth of the burden of proving a second time at trial that its evidence was constitutionally obtained, the trial judge must exclude evidence previously held admissible at the suppression hearing when the defendant proves by a preponderance of *new evidence* at trial that the evidence sought to be introduced by the Commonwealth was obtained by unconstitutional means.

*Monarch*, 507 A.2d at 77 (citations and quotation marks omitted). The court ruled that the trial court erred in considering the evidence from trial because such "evidence was not unavailable at the suppression proceeding and, thus, would not

support reversal under Pa.R.Crim.P. 323(j)." *Id.*[2]

In the instant case, the trial court did not grant a post-verdict motion and reverse its ruling denying Appellant's motion to suppress. Therefore, *Monarch* and the line of related cases that Appellant cites are entirely inapplicable. It matters not, as Appellant complains, whether the evidence introduced at trial was available to the Commonwealth at the suppression hearing, as the trial court did not reverse its ruling on the motion to suppress on the basis of Detective Singleton's trial testimony. Therefore, *Monarch* and the related cases that Appellant cites are to no avail. On appeal, this Court has considered the evidence from trial in affirming the trial court's pretrial suppression ruling denying a motion to suppress; a disposition upon which neither *Monarch* nor current Rule 581(J) have any bearing.

 Our foregoing analysis indicates that Detective Singleton possessed probable cause to arrest Appellant. Since either the evidence from the suppression hearing and/or trial demonstrate that Detective Singleton was the one who gave the order to arrest Appellant, Officer Soliman did not violate Appellant's Fourth Amendment rights when he arrested Appellant and brought him to the homicide office. *See*

*Rush, supra; Fromal, supra.* Accordingly, Appellant's claim that the trial court erred in denying his motion to suppress his inculpatory statement as a result of a Fourth Amendment violation fails.

Next, we consider the second part of Appellant's first question, which presents a Fifth Amendment challenge to the trial court's suppression ruling. Appellant argues that his right against self-incrimination was violated by the failure of Detective Singleton to administer *Miranda* warnings to Appellant prior to his interrogation. Although Detective Singleton gave Appellant *Miranda* warnings, he did so only after the passing of an indeterminate amount of time in the interrogation during which Appellant had already made incriminating statements. After Appellant received his *Miranda* warnings, he waived his rights and gave a similar incriminating statement. He now argues that this waiver of his rights was invalid due to Detective Singleton's failure to administer *Miranda* warnings from the outset of the interrogation.

The Commonwealth argues that this issue is waived due to Appellant's failure to specifically argue it at the suppression hearing. However, our review of the record reveals that Appellant claimed a *Mi-*

---

2. We note that the *Monarch* court nonetheless determined that the trial court properly granted the post-verdict motion since the evidence produced by the Commonwealth at the suppression hearing was insufficient to establish the legality of the warrantless entry into the defendant's home. The court stated:

The requirement ... that the admissibility of evidence cannot be relitigated at trial, prohibits a trial court's reversal of the suppression court simply because the Commonwealth failed to *re-prove* at trial probable cause for the arrest. However, where the suppression ruling is not supported by the record of the suppression proceeding, it is perfectly appropriate for the court, on post-verdict motions, to reverse its earlier suppression ruling. Indeed, in view of the requirement of Rule 1123 that suppression issues be preserved in post-verdict motions, it would be ludicrous to require the filing of such motions, but prohibit the court's meaningful review.

*See Monarch,* 507 A.2d at 79. *But see Commonwealth v. Fletcher,* 604 Pa. 493, 986 A.2d 759, 770 n. 6 (2009) (stating, "Former Rule 1123 required defendants found guilty prior to January 1, 1994 to file post-verdict motions to preserve issues for appellate review. Rule 1123 was rescinded in 1993 and replaced by Rule 1410, which made the filing of post-trial motions optional. Rule 1410 was renumbered and is currently Pa.R.Crim.P. 720.").

*randa* violation in his motion to suppress and at the suppression hearing. Motion to Suppress, 3/30/09; N.T., 8/17/09, at 4, 104. Yet the motion to suppress does not specify the particulars of the *Miranda* claim. At argument at the conclusion of the suppression hearing, Appellant's counsel argued that he was entitled to *Miranda* warnings when Officer Soliman initially arrested Appellant and that his subsequent incriminating statements were the result of the coercive circumstances created by Detective Singleton. Thus, while Appellant did not specifically premise his Fifth Amendment claim on the basis that he was subjected to an unconstitutional two-step interrogation process, he did present *Miranda* claims challenging the validity of his waiver due to two instances where the police allegedly violated his Fifth Amendment right against self-incrimination. While we could arguably deem Appellant's *Miranda* claim waived, we are loathe to do so due to the seriousness of the charges in this case and the fact that the record demonstrates that Appellant asserted *Miranda* claims before the trial court that challenged the admissibility of the statement he made to Detective Singleton on the basis that Appellant did not voluntarily waive his rights prior to giving the statement. Accordingly, we proceed to the merits of this issue.

Appellant's Fifth Amendment claim focuses on the circumstances surrounding his interrogation by Detective Singleton. Although Officer Soliman arrested Appellant on July 16, 2008, when Detective Singleton met with Appellant at approximately 9:30 p.m. that evening, Appellant appeared to be "under the influence of either alcohol or some narcotics substance." N.T., 8/17/09, at 52. Detective Singleton concluded that he would be unable to interview Appellant in that condition, and so Appellant remained overnight in an interview room, and Detective Singleton began his interrogation of Appellant the following day, on the morning of July 17th. *Id.* at 53–54.

At the beginning of the interrogation, Detective Singleton obtained Appellant's information in order to complete a police form detailing biographical data. Immediately after completing this form, Detective Singleton began interrogating Appellant "about the circumstances surrounding the murder." *Id.* at 56. During this interrogation, Appellant "explained in some detail what occurred in the house." *Id.* "At some point" during this interrogation, Detective Singleton gave Appellant his *Miranda* warnings and Appellant waived his rights. *Id.*[3] Detective Singleton "then proceeded to take a statement from him, a formal statement." *Id.* When questioned on cross-examination regarding the nature of the statement that Appellant gave prior to receiving his *Miranda* warnings, Detective Singleton explained that the prior oral statements were essentially identical to what was set forth in the subsequent formal written statement given after *Miranda* warnings.

Appellant argues that Detective Singleton "engaged in a single, unbroken custodial interrogation, first eliciting the entirety of a statement and only then giving *Miranda* warnings and reiterating the identical interview." Brief for Appellant at 17. Appellant claims that in *Missouri*

---

**3.** We note that in the first full paragraph of page twenty five in the trial court's opinion, it states that Detective Singleton gave Appellant his *Miranda* warnings immediately after "Appellant's biographical information was obtained." T.C.O., 5/27/10, at 25. This factual averment is not supported by the record, as Detective Singleton's testimony is unequivocal on the point of fact that he elicited a statement from Appellant incriminating himself in the murder prior to administering *Miranda* warnings.

*v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality opinion), the U.S. Supreme Court held this type of two-stage interrogation process violative of a defendant's Fifth Amendment right against self-incrimination.

In order to provide a cogent discussion of the *Seibert* decision, we must first address the seminal case of *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), and its progeny in this Commonwealth, the most recent of which is *Commonwealth v. DeJesus,* 567 Pa. 415, 787 A.2d 394 (2001), *abrogated on other grounds, Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385 (2003).

> In [*Elstad*], the Supreme Court considered the appropriate remedy when a suspect in custody is first interviewed without *Miranda* warnings and is later given proper warnings and interviewed again. In *Elstad,* the defendant was taken into custody for committing a burglary. He was initially questioned at the scene of the arrest and made an incriminating admission. After he was taken to the police station, *Miranda* warnings were given, he signed a written waiver, and confessed to the crime. The state appellate court held that, even if the confession had not resulted from actual compulsion, the defendant's initial statement had a coercive impact because it had let the 'cat ... out of the bag.' The state appellate court consequently held that the later statement had to be suppressed.

> The Supreme Court reversed, holding that "**absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion.**" The Court added that "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."

*Brosius v. U.S. Penitentiary, Lewisburg, PA,* 278 F.3d 239, 248–49 (3rd Cir.2002) (citations and quotation marks omitted) (emphasis added). The Court further reasoned:

> If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Elstad,* 470 U.S. at 309, 105 S.Ct. 1285. Therefore, part of the Court's holding in *Elstad* is that an unwarned statement is insufficient *per se* to establish a Fifth Amendment violation.

▆▆▆▆ Furthermore, the Court ruled that the requirement in cases involving coercion, that there be a break in the events sufficient to remove the taint of the coercion, is not applicable in cases where a defendant has given an unwarned statement followed by a warned statement.

> When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of

the interrogators all bear on whether that coercion has carried over into the second confession. *See Westover v. United States,* decided together with *Miranda v. Arizona,* 384 U.S. at 494 [86 S.Ct. 1602]. The failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised. **Of the courts that have considered whether a properly warned confession must be suppressed because it was preceded by an unwarned but clearly voluntary admission, the majority have explicitly or implicitly recognized that *Westover's* requirement of a break in the stream of events is inapposite.** In these circumstances, a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible. The warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an "act of free will."

*Id.* at 310–11, 105 S.Ct. 1285 (emphasis added) (citations and footnote omitted). In essence, *Elstad* stands for the rule that where an unwarned statement is not the product of police coercion, "a careful and thorough administration" of a defendant's *Miranda* rights will render any subsequent statement voluntary and knowing, and therefore, admissible. *Id.*

The Court rejected a rigid rule for determining when the administration of *Miranda* warnings in the midst of on ongoing interrogation will allow a defendant to make a knowing and voluntary waiver of his or her rights. Rather, what is required is an examination of the surrounding circumstances:

Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative.

*Id.* at 318, 105 S.Ct. 1285.

The Pennsylvania Supreme Court subsequently relied on *Elstad* in *DeJesus, supra.* In *DeJesus,* the defendant was imprisoned on other charges when the police secured a warrant for his arrest for murder. The court summarized the facts of the defendant's arrest and interrogation as follows:

By October 30, 1997, Detective John McDermott of the Philadelphia Police Department had secured an arrest warrant for Appellant in the present case. On that day, Detective McDermott and another detective transported Appellant, who had remained in custody, from prison to the Police Administration Building. They placed Appellant in an interview room at approximately 1:00 p.m., at which point, Appellant asked why he was being charged. Detective McDermott advised Appellant that the authorities had evidence in the form of statements from persons who had implicated him in the Vargas and Carrisquilla shootings. The detectives proceeded to complete the necessary biographical form with Appellant's input. Between 1:00 p.m. and 4:30 p.m., Detective McDermott informed Appellant on sev-

eral occasions about the charges that the Commonwealth was prepared to bring against him, and told him what Roman and Ortiz had said about him in the statements they had made respectively to the police regarding the shootings. On apparently the last of those occasions, Detective McDermott showed Appellant the statements that Roman and Ortiz had given. At about 4:50 p.m., Appellant told Detective McDermott that he did not shoot Carrisquilla; that he did not want to be blamed for her death; that he shot only Vargas; and that he wanted to set the record straight by making a statement. Detective McDermott advised Appellant that before he could make a statement, he had to be given his *Miranda* warnings. Detective McDermott gave Appellant the appropriate warnings, which Appellant acknowledged and waived, both orally and in writing. Detective McDermott then took down Appellant's statement in question and answer form.

*DeJesus,* 787 A.2d at 400–01.

Relying on *Elstad,* the court determined that while the unwarned statements were inadmissible due to a *Miranda* violation, the subsequent warned statement was admissible. In so holding, the court looked at the totality of the circumstances and determined that the defendant's warned confession "was voluntary, the result of his free and rational choice." *Id.* at 406. This conclusion was based in part upon the lack of any oppressive or threatening actions by the police. The court also relied on the fact that the police conducted a thorough reading of the defendant's rights and that the defendant was alert and coherent throughout this process.

*Seibert,* the case upon which Appellant chiefly relies, came after *Elstad* and *DeJesus,* and its effect on Fifth Amendment jurisprudence remains obscure due to the fact that it was a plurality decision with two concurring opinions and four Justices in dissent. *Seibert* involved an official policy of the local police department, learned from a national police training organization, which directed officers to employ "the strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession." *Seibert,* 542 U.S. at 609, 124 S.Ct. 2601. This fact was established by the testimony of the officer involved in the case who admitted that he

made a "conscious decision" to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question "until I get the answer that she's already provided once." He acknowledged that Seibert's ultimate statement was "largely a repeat of information ... obtained" prior to the warning.

*Id.* at 605–06, 124 S.Ct. 2601.

In *U.S. v. Rodriguez–Preciado,* 399 F.3d 1118 (9th Cir.2005), Judge Berzon wrote a dissenting opinion that set forth a detailed explanation of the Court's holding in *Seibert.*

For the *Seibert* plurality, the admissibility of statements taken post–*Miranda* in such a case turns on whether a midstream warning was effective under the circumstances.

As Justice Souter wrote for the four-member plurality,

The threshold issue when interrogators question first and warn later is ... whether it would be *reasonable* to find that in these circumstances the warnings could function "effectively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talk-

ing even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda,* or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

*Seibert,* [124 S.Ct. at 2610] (plurality opinion) (emphasis added); *see also id.* at 2611 ("When [*Miranda*] warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" (quoting *Moran v. Burbine,* 475 U.S. 412 [106 S.Ct. 1135, 89 L.Ed.2d 410] (1986))). Whether statements given after midstream *Miranda* warnings should be admissible, the plurality concluded, turned entirely on "whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object." *Id.* at 2612. Effectiveness, the plurality suggested, was a question of what the *suspect* reasonably believed. Depending on the circumstances, midstream warnings can "be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." *Id.* at 2613.

Concurring in the judgment, however, Justice Kennedy concluded that such a reasonableness test, which "envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations .... cuts too broadly." *Id.* at 2615–16. (Kennedy, J., concurring in the judgment). Justice

Kennedy believed that *Elstad* should govern absent a showing that the law enforcement officers deliberately attempted an end-run around *Miranda,* as in *Seibert. See id.*

That no opinion in *Seibert* commanded the agreement of a majority of the Justices creates a difficulty in determining which rule to apply here. Generally, where there is no majority opinion, the narrowest opinion adhered to by at least five Justices controls. *See Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). Applying the *Marks* rule to *Seibert,* however, is not a straightforward endeavor.

Justice Kennedy concurred in *Seibert* on a ground arguably narrower than that relied upon by the plurality. He stated that deliberateness on the part of the police—or the lack thereof—should guide the inquiry, not the objective effectiveness factors outlined in Justice Souter's plurality opinion. **But three of the four Justices in the plurality *and* the four dissenters decisively rejected any subjective good faith consideration, based on deliberateness on the part of the police.**[FN12] In dissent, Justice O'Connor, joined by the Chief Justice and Justices Scalia and Thomas, repeatedly agreed with the plurality that the subjective intent of the interrogator cannot control. *See, e.g., Seibert,* [124 S.Ct. at 2616] (O'Connor, J., dissenting) ("[T]he plurality correctly declines to focus its analysis on the subjective intent of the interrogating officer."); *id.* at 2617 ("The plurality's rejection of an intent-based test is also, in my view, correct."); *id.* ("Because voluntariness is a matter of the suspect's state of mind, we focus our analysis on the way in which suspects experience interrogation.... Thoughts kept inside a police officer's head can-

not affect that experience."); *id.* at 2618 ("[R]ecognizing an exception to *Elstad* for intentional violations would require focusing constitutional analysis on a police officer's subjective intent, an unattractive proposition that we all but uniformly avoid."). Most definitive is Justice O'Connor's statement at the end of Part I of her dissent: "[T]he approach espoused by Justice KENNEDY is ill advised.... This approach untethers the analysis from facts knowable to, and therefore having any potential directly to affect, the suspect." *Id.* at 2618–19.

FN12. Arguably, Justice Breyer's concurring opinion, though he fully concurred in (and joined) Justice Souter's opinion for the plurality, differs from the plurality on the deliberateness point. *See, e.g., Seibert,* [124 S.Ct. at 2614] (Breyer, J., concurring) (joining Justice Kennedy's opinion "insofar as it ... makes clear that a good-faith exception applies"). **Accepting this position for the sake of argument, the tally is seven to two against the subjective-intent-of-the-interrogator position.**

The dissenters went on to disagree with the plurality over the force of *Elstad:* The plurality, along with Justice Kennedy, favored creating an exception to *Elstad,* although the opinions differed fundamentally as to the nature of the exception. The dissent, in contrast, took issue with the extent to which the plurality "devour[ed]" *Elstad. Id.* at 2616. Under *Elstad,* the dissent suggested, "if [the defendant's] first statement is shown to have been involuntary, the court must examine whether the taint dissipated through the passing of time or a change in circumstances...." *Id.* at 2619. In so maintaining, however, the dissent also necessarily disagreed with the plurality that the relevant standard should be the objective effectiveness of the warnings. Instead, Justice O'Connor suggested that question-first interrogations should be analyzed "under the voluntariness standards central to the Fifth Amendment and reiterated in *Elstad." Id.*

*Rodriguez–Preciado,* 399 F.3d at 1138–40 (footnotes and citations omitted) (emphasis added) (Berzon, J. dissenting).

While five Justices agreed that there should be some exception to *Elstad,* the contours of that exception cannot be gleaned from the varying opinions in *Seibert.* Most importantly, at its core, Justice Kennedy's concurring opinion hinges on the intent of the interrogating officer; an approach specifically rejected by both the plurality and the dissent. We likewise find such an approach unworkable for the aforementioned reasons set forth in both the plurality and the dissent. And yet surprisingly, a majority of the Circuit Courts have adopted the position that Kennedy's concurring opinion represents the precedent established by *Seibert. See United States v. Torres–Lona,* 491 F.3d 750, 758 (8th Cir.2007); *United States v. Courtney,* 463 F.3d 333, 338 (5th Cir.2006); *United States v. Williams,* 435 F.3d 1148, 1157–58 (9th Cir.2006); *United States v. Street,* 472 F.3d 1298, 1313 (11th Cir.2006); *United States v. Naranjo,* 426 F.3d 221, 231–32 (3rd Cir.2005); *United States v. Mashburn,* 406 F.3d 303, 308–09 (4th Cir. 2005). However, two Circuit Courts have not adopted this position and have cited Judge Berzon's dissent in *Rodriguez–Preciado* with approval. *See U.S. v. Heron,* 564 F.3d 879, 885 (7th Cir.2009); *U.S. v. Carrizales–Toledo,* 454 F.3d 1142, 1151 (10th Cir.2006).

After a thorough review of these cases, and cognizant of the traditional focus on the reasonable belief of a defendant in Constitutional jurisprudence as it relates to criminal procedure, we decline to accept Justice Kennedy's subjective intent based test as controlling precedent. Rather, we

are persuaded by the following reasoning by Judge Berzon.

This analysis of the *Seibert* opinions indicates that while Justice Kennedy's was the crucial fifth vote for the result, and for the proposition that *Elstad* does not strictly govern cases with midstream *Miranda* warnings, Justice Kennedy's opinion is *not* the narrowest opinion embodying a position supported by at least five Justices in the majority. It embodies a position supported by two Justices, at most.

The *Marks* rule is not helpful under these circumstances. As several circuits have convincingly explained, "the *Marks* rule is applicable only where 'one opinion can be meaningfully regarded as "narrower" than another'" *and* "can 'represent a common denominator of the Court's reasoning.'" *Anker Energy Corp. v. Consolidation Coal Co.,* 177 F.3d 161, 170 (3rd Cir.1999) (quoting *King v. Palmer,* 950 F.2d 771, 781 (D.C.Cir.1991) (en banc)). The D.C. Circuit further explained this point in *King v. Palmer:*

> *Marks* is workable—one opinion can meaningfully be regarded as "narrower" than another—only when one opinion is a logical subset of other, broader opinions. **In essence, the narrowest opinion must present a common denominator of the Court's reasoning; it must embody a position implicitly approved by at least five Justices who support the judgment ....** When ... one opinion supporting the judgment does not fit entirely within a broader circle drawn by the others, *Marks* is problematic. **If applied in situations where the various opinions supporting the judgment are mutually exclusive,** *Marks*

will turn a single opinion that lacks majority support into national law. 950 F.2d at 781–82.

...

As I read it, in agreement with the other circuits' opinions discussed above, *Marks* does not prescribe the adoption as governing precedent of a position squarely rejected by seven Justices. Justice Kennedy's opinion on the admissibility standard therefore cannot govern.

If Justice Kennedy's opinion does not govern, then what does? There are three possibilities: The dissent controls; the plurality controls; or there is no controlling position....

The *Seibert* dissent cannot govern because the holding that *Elstad* does not control in a case like this one *received five votes*. The dissent's position in *Seibert* is therefore irreconcilable with the conclusion of the majority of the Court. The plurality opinion is not binding precedent either, at least as to the admissibility standard, for no fifth vote supporting its rationale is to be found. Instead, I suggest that *Seibert* leaves this court in a situation where there is no binding Supreme Court or Ninth Circuit precedent as to the governing standard.

*Rodriguez–Preciado,* 399 F.3d at 1138–40 (footnotes and citations omitted) (emphasis added) (Berzon, J. dissenting).

We agree that *Seibert* establishes no new binding precedent, and therefore, this Court is bound by the precedent established by the Pennsylvania Supreme Court in *DeJesus,* which followed *Elstad's* focus on the knowingness and voluntariness of the waiver in cases where coercion is absent.[4] Applying that precedent to the case

---

4. We note that Appellant has cited *Commonwealth v. Eichinger,* 591 Pa. 1, 915 A.2d 1122 (2007), for the proposition that there is a "clear *Seibert* rule." Reply Brief at 2. Al-

before us, we conclude that Appellant has failed to demonstrate a violation of the Fifth Amendment. On appeal, Appellant does not argue that his first statement was coerced. Rather, he focuses solely on the circumstances of interrogation and claims that since there was no break in the events or any curative measures taken after Appellant gave the unwarned statement, the subsequent warned statement was inadmissible.

Consistent with the rulings in *Elstad* and *DeJesus*, our analysis, however, hinges upon whether Appellant's warned statement after he waived his rights was knowing and voluntary. Detective Singleton testified at the suppression hearing as to the procedure he followed in administering *Miranda* warnings to Appellant. He testified that there were seven questions that were read to Appellant explaining his rights, among which were his right to remain silent, his right to an attorney even if he cannot afford one, and the fact that what he says can be used against him. N.T., 8/17/09, at 58–59. Appellant acknowledged receiving these rights by placing his initials at the conclusion of each answer.

■ From the beginning of Detective Singleton's interaction with Appellant on the morning of July 17th, Appellant was "immediately receptive" and was "very cooperative and eager to give his portion of the story." *Id.* at 70–71. During the interrogation, he was permitted to use a restroom and was given a sandwich and something to drink. *Id.* Under these circumstances, we have no difficulty concluding that Appellant's waiver of his rights

and the subsequent statement were both knowing and voluntary. Accordingly, Appellant is not entitled to relief on his first question.

■ In the second question presented for our review, Appellant challenges the admissibility of evidence regarding a statement made by Ms. Sanders to the victim's mother, Ms. Stanton. "In reviewing the trial court's rulings, we are guided by the rule of law that the admissibility of evidence is a matter addressed to the sound discretion of the trial court, which may only be reversed upon a showing that the court abused its discretion." *Commonwealth v. Mayhue*, 536 Pa. 271, 639 A.2d 421, 431 (1994). "An abuse of discretion is not merely an error of judgment, but the misapplication or overriding of the law or the exercise of a manifestly unreasonable judgment based upon partiality, prejudice or ill will." *Commonwealth v. McGinnis*, 450 Pa.Super. 310, 675 A.2d 1282, 1285 (1996) (quotation marks omitted).

At trial, the Commonwealth sought to elicit from Ms. Sanders that she had a conversation with Ms. Stanton wherein she informed Ms. Stanton that Appellant had told Ms. Sanders, one week before the murder, of his intent to rob the victim. N.T., 8/20/09, at 35–36. Ostensibly, the aim of eliciting this testimony would be to discredit Appellant's claim of self defense. However, Ms. Sanders denied ever having such a conversation with Ms. Stanton. *Id.* Ms. Sanders was a reluctant witness, and she even testified that "she did not want to be a witness in this case . . . didn't want to

---

though the court mentioned *Seibert* in *Eichinger,* it was but a two sentence passing reference to the plurality's holding. This statement in *Eichinger* was dicta. The court did not acknowledge, much less analyze, the varying opinions in *Seibert*, which it surely would have undertaken had it been adopting

a new rule from *Seibert*. Of course, our Supreme Court may, in the future, consider any of the various opinions in *Seibert* as persuasive authority for fashioning an exception to *Elstad*. But this Court does not have that same prerogative.

be involved" and that she was concerned about her family and her children. *Id.* at 37–38.

Subsequently, the Commonwealth sought to elicit testimony from Ms. Stanton regarding the conversation she had with Ms. Sanders. The purpose of this evidence was to impeach Ms. Sanders' testimony wherein she denied ever having a conversation with Ms. Stanton regarding Appellant's intent to rob the victim. The defense objected on the basis that Ms. Sanders' statement to Ms. Stanton was hearsay. The Commonwealth's response was that the evidence was being elicited not for the truth of the matter asserted, but instead for impeachment purposes only. *See* Pa.R.E. 801 (stating, " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").

The admissibility of Ms. Stanton's testimony for impeachment purposes is governed by Pa.R.E. 613(b), which states:

> **(b) Extrinsic evidence of prior inconsistent statement of witness.** Unless the interests of justice otherwise require, extrinsic evidence of a prior inconsistent statement by a witness is admissible only if, during the examination of the witness,
>
> > (1) the statement, if written, is shown to, or if not written, its contents are disclosed to, the witness;
> >
> > (2) the witness is given an opportunity to explain or deny the making of the statement; and
> >
> > (3) the opposing party is given an opportunity to question the witness.

After taking the matter under advisement the court ruled that Ms. Stanton could testify regarding her conversation with Ms. Sanders because Ms. Stanton's testimony would qualify as extrinsic evidence of a prior inconsistent statement under Rule 613(b).

 Upon review, we conclude the court did not abuse its discretion in admitting the evidence under Rule 613(b). Subsection one of the rule was complied with because the Commonwealth disclosed to Ms. Sanders the contents of her statement to Ms. Stanton. The Commonwealth also complied with subsection two because it asked Ms. Sanders if she made the statement and she denied making it. Finally, subsection three was satisfied, as the defense was given an opportunity to question Ms. Sanders. Therefore, Ms. Stanton's testimony in which she relayed Ms. Sanders' prior inconsistent statement was property admitted for purposes of impeachment.

Appellant also argues that even if the evidence was properly admitted for purposes of impeachment, the court gave an erroneous cautionary instruction following the testimony because it allegedly contained some equivocation. More particularly, Appellant complains that the trial court did not adequately apprise the jury of the proscription against considering Ms. Stanton's testimony regarding what Ms. Sanders said for the truth of the matter asserted in Ms. Sanders' alleged statement. *See, e.g., Commonwealth v. Sattazahn,* 563 Pa. 533, 763 A.2d 359, 365 (2000) (setting forth the standard jury instruction that should follow the introduction of evidence of a prior inconsistent statement).

 The Commonwealth argues that Appellant has waived any objection to the adequacy of the instruction, as he did not object after the court gave the instruction.

A specific and timely objection must be made to preserve a challenge to a particular jury instruction. Failure to do so results in waiver. Generally, a defendant waives subsequent challenges to the propriety of the jury charge on

appeal if he responds in the negative when the court asks whether additions or corrections to a jury charge are necessary.

*Commonwealth v. Moury,* 992 A.2d 162, 178 (Pa.Super.2010). In the instant case, after the trial court ruled that it would admit the testimony and follow it up with a jury instruction, defense counsel stated, "Yes, your Honor." N.T., 8/20/09, at 109. More importantly, after Ms. Stanton testified and the court gave its cautionary instruction, defense counsel offered no objection. *Id.* at 116. Under these circumstances, we conclude that Appellant has failed to preserve a challenge to the court's jury instructions for our review. Therefore, the claim is waived.[5]

In the third question presented for our review, Appellant claims that the trial court erred in making several evidentiary rulings. The first challenged ruling is the admission of evidence regarding Appellant's tattoos. On cross-examination, the Commonwealth elicited the following testimony:

Q. Now, excuse my language ladies and gentlemen of the jury, the phrases, By any means necessary, fuck it, shit happens, these are three phases that are important to you?

A. Why would you say that?

. . .

Q. You've chosen to put them on your body by a tattoo, By any means necessary, fuck it, shit happens, correct?

A. Yes, I have—I do have them as tattoos, yes.

N.T., 8/24/09, at 137.

Appellant's main argument is that "Pennsylvania clearly bars character evidence in a criminal case." Brief for Appellant at 24. This is a plainly erroneous claim. "In a criminal case, evidence of a *pertinent trait* of character of the accused is admissible when offered by the accused, or by the prosecution to rebut the same." Pa.R.E. 404(a)(1) (emphasis added). "[O]ur Supreme Court has interpreted the term 'pertinent' to refer to a character trait that is relevant to the crime charged against the accused." *Commonwealth v. Minich,* 4 A.3d 1063, 1071 (Pa.Super.2010).

In the instant case, the Commonwealth claims that the evidence was admissible as a pertinent character trait because Appellant testified in his own defense that he did not carry a firearm or associate with individuals who carried firearms. "The scope of cross-examination of a defendant in a criminal case is one of great latitude." *Commonwealth v. Petrakovich,* 459 Pa. 511, 329 A.2d 844, 850 (1974). "[T]he scope of permissible cross-examination will necessarily depend on the testimony of the defendant and what, in the discretion of the trial court, becomes relevant by virtue of that testimony." *Commonwealth v. Marinelli,* 589 Pa. 682, 910 A.2d 672, 687 (2006).

At trial, Appellant not only testified that he acted in self-defense, but also that he had some sort of aversion towards firearms. Thus, after he shot Appellant to death, he removed the firearm from the

**5.** We note that Appellant also claims that it was error for the trial court to admit this evidence because the prosecutor referenced it as substantive evidence in her closing argument. Whether or not the prosecutor made improper remarks during her closing argument is not relevant in our review of a prior evidentiary ruling. If indeed the prosecutor's remarks were objectionable, then Appellant should have lodged an objection at that point and based any claim on appeal on the trial court's ruling on that objection. That did not occur here.

house and dumped it in a sewer for public safety reasons. N.T., 8/24/09, at 122. In particular, he feared that a person, maybe a child, would enter the house and accidentally discharge the handgun, thereby injuring someone. *Id.* at 123–24. Through his testimony, Appellant sought to portray himself as a person who avoided firearms, and when he came into contact one, he threw it down a sewer in order to protect the children in the neighborhood. In contrast, his tattoos conveyed the unavoidable message that he would do anything necessary to achieve the ends he desired, and if something unfortunate happened in the process, it would be of no consequence to him. Thus, while Appellant attempted to show that he had a selfless character, the evidence of the tattoos contrarily demonstrated his selfish nature. Accordingly, we conclude that the trial court did not abuse its discretion in permitting the introduction of this evidence.[6]

 Next, Appellant argues that the trial court erred in permitting the Commonwealth to introduce hearsay testimony from Detective Singleton in which he stated that a crew chief from the sewer department had informed Detective Singleton that the sewer had been cleaned two weeks prior and no firearm was recovered. N.T., 8/21/09, at 170–71. We agree with Appellant that such evidence constitutes hearsay. *See* Pa.R.E. 801. However, we conclude that its introduction constituted harmless error.

 We have identified three scenarios where the erroneous admission of evidence may constitute harmless error.

Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was *de minimis;* (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that. the error could not have contributed to the verdict.

*Commonwealth v. Atkinson,* 987 A.2d 743, 751–52 (Pa.Super.2009).

While the admission of this hearsay evidence potentially qualifies under all three theories, we rely only on the first two. First, the evidence in question demonstrated that Appellant *may* have been untruthful when he testified that he threw the gun down the sewer. Thus, the jurors could have concluded that he in fact threw it in the sewer, but it was never found, or that he was not truthful about throwing the gun in the sewer. This fact had little bearing on whether Appellant acted in self-defense. Accordingly, we conclude that to the extent this evidence prejudiced Appellant, such prejudice was *de minimis.*

Second, Detective Singleton testified that he was personally present when the sewer department dredged the sewers and searched for the gun. He testified that no gun was found. Thus, the fact that the sewer crew chief informed Detective Singleton that no gun was found two weeks earlier was merely cumulative of the fact that ultimately, no gun was ever found in

---

6. We note that in its opinion, the trial court found the evidence to be not relevant due to the ambiguous nature of the statements in the tattoos. T.C.O., 5/27/10, at 30. Despite ruling the evidence admissible at trial, in its opinion, the court reasoned that it was necessary for the Commonwealth to have adduced evidence regarding the meaning of the tattoos in order for the statements contained therein to be admissible. We are unpersuaded by this reasoning, and we note that this Court may affirm the decision of the trial court on any basis. *See Commonwealth v. Lauro,* 819 A.2d 100, 105 n. 8 (Pa.Super.2003).

the sewer. Consequently, for both these reasons, we conclude that the erroneous admission of this hearsay evidence was harmless.[7]

Finally, Appellant argues that the trial court erred in precluding the defense from introducing evidence demonstrating the victim's prior violent conduct. At trial, Appellant sought to elicit testimony from Tracey Leslie as to whether he knew if the victim "had a criminal past." N.T., 8/19/09, at 53. The Commonwealth objected and the trial court sustained the objection. At sidebar, defense counsel argued that "if there's going to be a defense of self defense, I think one of the things that's important to know is whether or not the decedent had the propensity for violence." *Id.* at 55. The court responded that "if that's what your defense is, then you need to present that in your own case." *Id.* at 57.

▪ "[E]vidence of a victim's prior violent conduct is relevant to establish both the victim's character for violence and the reasonableness of defendant's belief that he was in danger of death or serious bodily injury." *Commonwealth v. Yanoff,* 456 Pa.Super. 222, 690 A.2d 260, 265 (1997). Although the trial court prohibited the defense from introducing evidence of the victim's criminal past during the Commonwealth's case, it permitted Appellant to repeatedly testify regarding the fact that the victim had been incarcerated and that he knew the victim always carried a gun. On appeal, Appellant claims that he was nonetheless prejudiced by the court's ruling because the jury disbelieved his testimony on these points. However, the existence of a criminal record could have been easily established by reference to docket numbers, particular convictions, and the sentences that Appellant served. In point of fact, the victim's mother testified that the victim had been incarcerated and that during "those times," Appellant would check in on the victim's mother to see if she needed anything. N.T., 8/20/09, at 70–71. Under these circumstances, we find it highly unlikely that the jury disbelieved Appellant's testimony regarding the victim's past criminal behavior. Therefore, Appellant's final issue is to no avail.

Judgment of sentence affirmed.

---

7. We note that the trial court concluded that this evidence did not constitute hearsay because it was not introduced for the truth of the matter asserted, but rather to explain Detective Singleton's course of conduct. Again, we are unpersuaded by such reasoning, but nonetheless affirm the court's ruling on the basis of the reasoning set forth above. *See* Note 5, *supra.*