J-A05033-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| I. DEAN FULTON, | |
| Appellant | No. 768 EDA 2015 |

Appeal from the Judgment of Sentence February 11, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0007870-2013; CP-51-CR-0007871-2013

BEFORE:  OLSON, J., OTT, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED MAY 04, 2016**

This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following Appellant's conviction by a jury on the charges of aggravated assault (as to Lamar Henderson), 18 Pa.C.S.A. § 2702, firearms not to be carried without a license, 18 Pa.C.S.A. § 6106, carrying a firearm on a public street in Philadelphia, 18 Pa.C.S.A. § 6108, and possession of an instrument of crime, 18 Pa.C.S.A. § 907.[1]   We affirm.

_____

[1] As discussed in further detail *infra*, the jury acquitted Appellant on the charges of murder, 18 Pa.C.S.A. § 2502, and conspiracy to commit murder, 18 Pa.C.S.A. § 903, in connection with the death of Dominique Jenkins.

*Former Justice specially assigned to the Superior Court.

Appellant was arrested and, represented by counsel, he proceeded to a jury trial. The trial court has exhaustively set forth the facts as derived from the testimony and evidence presented at trial as follows:

Officer Alfonse Johnson testified that he received a radio call reporting shots fired in the area of 62nd Street and Chelwynde Avenue in Philadelphia at approximately 6:15 p.m. on January 24, 2010. N.T., 10/09/14, Trial (Jury) Vo. 2 at pp. 81, 84-85. When he arrived, he observed complainant Lamar Henderson at the intersection of Felton Street and Chelwynde Avenue suffering from a gunshot wound to his lower back/buttock area. *Id.* at pp. 86-87. He then observed the decedent, Dominique Jenkins, lying face down between the tires and partially under the passenger's side of a SUV parked on Chelwynde Avenue. *Id.* at pp. 88-89. The decedent was bleeding from his face and head. *Id.* at p. 91. The decedent appeared to be breathing, but was unable to speak or move. *Id.* at p. 92.

Dr. Edwin Lieberman, Medical Examiner, testified that the decedent (age 23) was pronounced [dead] at 1:23 p.m. on January 25, 2010, at the Hospital of the University of Pennsylvania (H.U.P.). N.T., 10/14/14/, at pp. 7-8. The decedent died as a result of a gunshot wound to the head; the manner of death was homicide. *Id.* at pp. 14-15. The decedent sustained a single penetrating gunshot wound to his head; the range of fire was indeterminate. The bullet entered the left side of the decedent's forehead and passed backward, slightly rightward, through his frontal bone, left frontal lobe, and left temporal lobe. *Id.* at pp. 9-11. The bullet was recovered from the decedent's brain. N.T., 10/10/14, at pp. 152-53.

Dr. Lieberman testified that the gunshot wound to the decedent's head would have caused immediate incapacitation. N.T., 10/14/14, at pp. 9-11. The decedent had abrasions and a laceration over the center of his forehead and on the bridge of his nose. Dr. Lieberman testified that these injuries were consistent with the decedent losing the ability to use his body parts and falling onto his face if standing. *Id.*

[Defense] [c]ounsel stipulated that Detective Strunk recovered two small fired bullet fragments from H.U.P.: one was

- 2 -

recovered from on top of the decedent's clothing near his chest; the second was a circular fragment recovered from the trauma unit floor just below where the decedent was being treated. N.T., 10/10/14, at pp. 151-52.

Officer Donna Jaconi of the Crime Scene Unit testified to the evidence collected from the scene: a .25 caliber black Titan pistol loaded with one bullet in the chamber and five bullets in the magazine were recovered near the southwest corner of 62nd Street and Chelwynde Avenue; an inoperable .25 caliber black and gold pistol without a magazine was recovered underneath the decedent's body; and a .9 millimeter black Makarov pistol loaded with one bullet in the chamber and six bullets in the magazine were also recovered underneath the decedent's body. N.T., 10/10/14, at pp. 121-34. All three firearms came up negative for fingerprints. *Id.* at p. 138.

Officer Jaconi testified that she recovered four fired cartridge casings (FCC) at the scene. Three .380 caliber FCCs were recovered near the intersection of 62nd Street and Chelwynde Avenue. One .25 caliber FCC was collected from the sidewalk near the decedent's body. A black baseball cap with what appeared to be blood on it was recovered from underneath the SUV where the decedent's body was found. *Id.* at pp. 118-27.

Officer Lawrence Flagler of the Firearms Identification Unit testified that the three firearms collected at the scene were all semi-automatic firearms. N.T., 10/10/14, at p. 170. The .9 millimeter Makarov pistol recovered under the decedent's body was in the "cocked" position, meaning that the safety was engaged, but the weapon was ready to be fired. *Id.* at pp. 178, 191. The black and gold gun recovered from underneath the decedent's body was incapable of firing because it was missing the firing pin assembly. *Id.* at pp. 169-70.

Officer Flagler conducted a comparison of the four FCCs recovered at the scene. The .25 caliber FCC was fired from the .25 caliber Titan pistol recovered near the southwest corner of 62nd Street and Chelwynde Avenue. *Id.* at pp. 168-69. The three .380 caliber FCCs were all fired from the same firearm; however, they were not fired from any of the firearms recovered at the scene. *Id.* at pp. 167-68. None of the FCCs recovered matched the .9 millimeter firearm recovered underneath the decedent's body. *Id.* at p. 177.

Officer Flagler testified that the bullets recovered from the decedent's brain were not fired from either of the firearms recovered from underneath the decedent's body and had insufficient microscopic markings when compared to the .25 caliber Titan pistol recovered at the scene. *Id.* at pp. 182-85, 199-202.

Officer Flagler testified that the bullet jacket recovered from H.U.P. was not fired from any of the three firearms recovered at the scene due to differences in the lands and grooves and rifling. *Id.* at p. 182. He also testified that the bullet recovered from H.U.P. was between .22 and .25 caliber; had insufficient microscopic markings when compared to the .9 millimeter pistol; and was not fired from the .25 caliber Titan pistol or the inoperable .25 caliber black and gold pistol. However, Officer Flagler did testify that the bullet jacket and bullet could have been fired from the unrecovered .380 firearm that was responsible for the three .380 FCCs recovered at the scene. *Id.* at pp. 183-84.

Lamar Henderson testified that he knew the decedent, Dominique Jenkins, since Henderson was 13 years-old; they were like family. N.T., 10/09/14, at p. 125. Both Henderson and the decedent had known [Appellant] for approximately one year to a year-and-a-half prior to the shooting. *Id.* at pp. 123, 129. Henderson and the decedent regularly hung out with [Appellant] at mutual friend Mark Jordan's house. *Id.* at pp. 123-24. Henderson also hung out with Mark's brother, Steven Jordan. *Id.* at p. 124. [Appellant] and Steven were friends. *Id.* at p. 157.

Henderson testified that the decedent wanted to purchase a gun, and that the decedent ultimately purchased a small, silver gun from [Appellant] for $200.00. *Id.* at pp. 127-28. Approximately one week prior to the shooting, [Appellant] asked the decedent if he could borrow the gun back. The decedent agreed. [Appellant] gave the decedent a small black and gold gun as "collateral" and an extra $40.00 for allowing him to borrow the gun since the decedent had just purchased it from [Appellant]. *Id.* at pp. 128-29.

On the day of the shooting, [Appellant] called the decedent and told him to meet him on 62nd Street and Buist Avenue to exchange the guns. *Id.* at p. 131. Henderson testified that [Appellant], Steven Jordan, the decedent, and he met on the

corner, exchanged handshakes, and walked to 62nd Street and Chelwynde Avenue. *Id.* at pp. 131-32.

Henderson testified that [Appellant] and the decedent were standing close to each other, face-to-face—[Appellant] was facing 63rd Street, [while] the decedent was facing 62nd Street. *Id.* at pp. 161-62. Steven Jordan was standing somewhat behind [Appellant]. *Id.* at pp. 162-63. Henderson testified that he was standing towards Dicks Avenue, and that he had a clear view of [Appellant], the decedent, and Steven Jordan. *Id.* at p. 195.

Henderson testified: "We got to the corner of 62nd and Chelwynde. Dom (the decedent) had the collateral gun in his hand ready to just make the exchange. [Appellant] then pulled out the other weapon and just started shooting...**He shot Dom point-blank and then as I tried to get away, he shot me.**" *Id.* at pp. 131-33 (emphasis added). [Appellant] was standing approximately two-and-a-half to three feet away from the decedent when he shot him in the forehead. *Id.* at p. 166. Henderson testified that the decedent immediately fell against the car that he was standing next to after [Appellant] shot him. *Id.* at pp. 195, 222. He also testified that [Appellant] was still shooting at him (Henderson) as he tried to run away. *Id.* at p. 224.

When Henderson heard the shots stop, he turned and saw [Appellant] and Steven Jordan running toward 62nd Street and Lindbergh Boulevard. *Id.* Henderson hobbled down Chelwynde Avenue toward 63rd Street and when he got to the corner of Chelwynde and Felton Street, he realized that the decedent wasn't with him. *Id.* at p. 175. Henderson moved himself into the street and started screaming for help. *Id.* at pp. 133-35, 223.

Henderson was transported to H.U.P. where he was treated for a perforating gunshot wound to the left buttock and a penetrating gunshot wound to the back of his right leg. *Id.* at pp. 134-35. Henderson walked with crutches and a cane for six to seven months after the shooting. The bullet is still lodged in his right leg. *Id.* at pp. 139-40.

Henderson testified that he did not immediately tell detectives that he knew who shot the decedent and him because he did not want anything to happen to his family and friends that

lived in th[e] area. ***Id.*** at pp. 140-43. Henderson did tell detectives that there were two people involved in the shooting, and that the shooter was a black male, wearing a black sweatshirt with a hood up, a black skullcap, and tan Timberland boots; the other male was wearing a green, possibly camouflage coat with his hood up. ***Id.*** at p. 143. Henderson testified that this was an accurate description of what [Appellant] and Steven Jordan were respectively wearing at the time of the shooting. ***Id.*** at pp. 143-44.

On January 25, 2010, Henderson identified [Appellant] as the shooter to detectives. He testified that he did so after learning that the decedent, his best friend, had died. Henderson also told detectives about the exchange of guns between [Appellant] and the decedent; however, he did not identify Steven Jordan as the other male present with [Appellant] at the time of the shooting. ***Id.*** at pp. 145-49. Henderson testified that he did not identify Steven because he had known him for a number of years, didn't want Steven to get in trouble, and was not sure whether Steven had a part in what happened. ***Id.*** at 153. He also did not want anything to happen to his family. ***Id.*** at 149.

On March 5, 2010, Henderson identified Steven Jordan to detectives as the other male present with [Appellant] at the time of the shooting, and he again identified [Appellant] as the shooter. ***Id.*** at p. 152. Henderson testified that he decided to give up Steven's name because the decedent "was dead and that was the bottom line." ***Id.***

On cross-examination, Henderson testified that the decedent and he knew [Appellant] as "Reds." ***Id.*** at p. 159. He did not know [Appellant] by his real name. ***Id.*** He also testified that the decedent and he never had any problems with [Appellant]; the decedent only expressed to Henderson that he was upset that he could not get in touch with [Appellant] to get back the gun that he had purchased from [Appellant]. ***Id.*** at pp. 160, 183.

James Crosby testified that he heard gunshots as he was driving home on 62nd Street towards Chelwynde Avenue around 6:15 p.m. on January 24, 2010. N.T., 10/14/14, at pp. 28-31, 40-41. He then observed two black males standing on the sidewalk on the corner of 62nd Street and Chelwynde Avenue. ***Id.*** at pp. 28-31, 46. Crosby testified that he would normally

make a left on Chelwynde Avenue and park near that corner, but he saw two males and realized that they were shooting. *Id.* at p. 29. One of the males had his arm extended level towards 63rd Street. *Id.* at pp. 30-31, 43. Crosby described that male as black, young, and thin. *Id.* at pp. 46, 51-52.

Crosby testified that he made a U-turn on 62nd Street and as he did, he observed the two males, one of [whom] was the male who had his arm extended, running down 62nd Street towards Lindbergh Boulevard. *Id.* at pp. 31-33. He also observed complainant Lamar Henderson, limping on Chelwynde Avenue toward Felton Street. Henderson was on the phone with the police. *Id.* at p. 36. Crosby exited his vehicle and approached Henderson. Crosby testified that Henderson was pulling on his clothes to try and see where he had been shot, then stated to Crosby: "they killed my cousin." *Id.* at p. 34. Crosby stepped onto the sidewalk, looked down the street, and observed the decedent lying near a vehicle on the corner of 62nd Street and Chelwynde Avenue. Crosby testified that he stayed with Henderson until the ambulance arrived; he did not see Henderson with a gun at any time.

Eric Adams testified that he often hung out at Mark Jordan's house and met [Appellant], whom he knew as "Faheem," through Mark's brother, Steven Jordan. N.T., 10/09/14, at pp. 246-48, 281. He knew the decedent as "Dom" or "Black." *Id.* at p. 272.

In a statement to detectives on September 3, 2010, Adams stated that [Appellant], also known as "Reds," called and told Adams that he shot the decedent. *Id.* at pp. 275-76. [Appellant] told Adams that Steven Jordan and he met up with the decedent to give the decedent his gun back; the decedent was with someone named "MarMar." *Id.* at pp. 278, 281. [Appellant] stated to Adams that he wasn't going to meet the decedent at first, and that he was going to "burn him" for the gun, but the decedent kept calling him. *Id.* [Appellant] told Adams that when he was about to give the decedent the gun back, the decedent reached in his jacket like he had a gun. [Appellant] stated to Adams that "he got nervous and pulled the gun out" and shot the decedent two or three times. *Id.*; N.T., 10/10/14, at p. 22. [Appellant] told Adams that he dropped the gun and ran off. *Id.*

Adams denied having this conversation with [Appellant] at trial. *Id.* at p. 275.

Officer John Krewer testified that he came into contact with [Appellant] in the rear alleyway behind Steven Jordan's home at 6036 Lindbergh Boulevard on June 17, 2010. N.T., 10/10/14, at pp. 93-94. [Appellant] was with Eric Adams and five to six other males. *Id.* at p. 95. [Appellant] stated that his name was "Faheem Miller," and when Officer Krewer asked [Appellant] for his date of birth, [Appellant] responded "fuck you." *Id.* at p. 96. Officer Krewer testified that [Appellant] told him that his date of birth was July 12, 1995, and then stated that it was July 11, 1995. *Id.* at pp. 96-97. Officer Krewer requested [Appellant] tell him his real name and date of birth. [Appellant] stated that his name was "Faheem Brown," and that the second date of birth he had given was real. *Id.* at p. 96. [Appellant] refused to answer any other questions regarding his biographical information. *Id.* at p. 99.

Detective Gregory Singleton testified that Lamar Henderson provided a physical description of [Appellant] in a statement to detectives on January 25, 2010. Detective Singleton testified that he entered the information into the system which yielded a few photographs, one of which Henderson identified as "Reds," [Appellant]. N.T., 10/14/14, at pp. 99-100. In a second statement to police on March 5, 2010, Henderson identified the second male present during the shooting as Steven Jordan. *Id.* at pp. 101-02.

Detective Singleton also testified that Eric Adams gave a statement on September 3, 2010, wherein Adams stated that [Appellant] told him that he was present at the time of the shooting; that he did fire a gun; that he shot the decedent; that he dropped the gun when he left the location of the shooting; and that Steven Jordan was present with him. *Id.* at pp. 106-09, 111-12. Adams identified photographs of the decedent, Henderson, Steven Jordan, and [Appellant], whom he referred to as "Reds" or "Red Fox." *Id.* at p. 109. Adams stated that he was living with Steven Jordan at the time of the shooting. *Id.* at pp. 109-10.

Detective Singleton testified that he obtained the decedent's cell phone records and records from the number Adams stated belonged to [Appellant], [(XXX) XXX]-7343. *Id.* at pp. 121-22. The 7343 phone number was registered to a

"Saheen Brown." *Id.* at pp. 115-21. Multiple calls were made from the decedent's cell phone to that 7343 phone from 4:00 p.m. to 5:37 p.m. on the night of the shooting. At 5:47 p.m., the decedent received an incoming phone call from that 7343 phone. *Id.* at p. 119. Henderson told detectives that the decedent received a phone call from [Appellant] shortly before the shooting. The decedent then made three phone calls to that 7343 phone at 6:05 p.m., 6:10 p.m., and 6:12 p.m. *Id.* at p. 120. There are no other calls made to or from the decedent's phone after that time. *Id.*

Detective Singleton testified that Steven Jordan gave a statement to detectives. Steven stated that he was not present when the decedent and Henderson were shot, and that he was somewhere around 70th Street and Lindbergh Boulevard with a friend whose name he refused to provide. He also stated that he does not hang out with "Reds" [Appellant], and that the last time that he saw [Appellant] was at a party a few weeks prior to the shooting. *Id.* at p. 145.

Steven Jordan testified for the defense. He stated that he was not present at the time of the shooting. N.T., 10/14/14, at pp. 156-57. On cross-examination, he testified that he has known [Appellant] for approximately ten years; they grew up in the same neighborhood. *Id.* at p. 161. He knew both the decedent and Lamar Henderson for approximately three years; Henderson was friends with his brother, Mark. *Id.* at pp. 163-66. Steven also testified that he was with his god-brother at 70th Street and Muhlfeld Street at the time of the shooting. *Id.* at pp. 167-69.

Trial Court's Pa.R.A.P. 1925(a) Opinion, filed 8/7/15, at 2-11 (emphasis in original).

At the conclusion of all testimony, the jury convicted Appellant of the offenses indicated *supra* in connection with the shooting of Henderson. The jury acquitted Appellant on the charges of murder and conspiracy to commit murder in connection with the death of Jenkins.

Following the jury's verdict, defense counsel withdrew his representation and new counsel entered her appearance. On February 11, 2015, the trial court imposed an aggregate sentence of nine years to eighteen years in prison, and on February 17, 2015, Appellant filed a timely, counseled post-sentence motion. Without holding a hearing, the trial court denied the post-sentence motion, and this timely, counseled appeal followed on March 16, 2015. All Pa.R.A.P. 1925 requirements have been met.

Appellant presents the following issues for our review:

I.     Whether the trial court erred when it denied Appellant's motion for judgment of acquittal, arrest of judgment or a new trial on the conviction for aggravated assault?

II.    Whether the trial court erred and denied due process of law guaranteed by the Fourteenth Amendment when it denied the motion for a new trial on the charge of aggravated assault since the jury was not informed that [Appellant] was entitled to be acquitted of aggravated assault if he shot Mr. Jenkins in self-defense and Mr. Henderson was unintentionally shot as a bystander?

III.   Whether the trial court erred when it denied the motion for a new trial based on ineffective assistance of counsel?

IV.    Whether the evidence was sufficient to establish aggravated assault beyond a reasonable doubt?

Appellant's Brief at 5.

Appellant's first and fourth contentions are intertwined. In both claims, he challenges the sufficiency of the evidence supporting his conviction for aggravated assault as to Henderson.[2]

> The standard we apply when reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence. Furthermore, when reviewing a sufficiency claim, our Court is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.
> However, the inferences must flow from facts and circumstances proven in the record, and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of an accused's guilt beyond a reasonable doubt. The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fail even under the limited scrutiny of appellate review.

---

[2] To the extent Appellant suggests a new trial is warranted due to the insufficiency of the evidence, we note that when the evidence presented is insufficient to support a conviction, the proper remedy at law is an arrest of judgment or judgment of acquittal but not a new trial. ***Commonwealth v. Vogel***, 501 Pa. 314, 461 A.2d 604, 607 (1983).

*Commonwealth v. Slocum*, 86 A.3d 272, 275-76 (Pa.Super. 2014) (quotation and citation omitted).

Appellant was convicted of aggravated assault under 18 Pa.C.S.A § 2702(a)(1),[3] which provides, in relevant part, the following:

> **§ 2702. Aggravated assault**
> **(a) Offense defined.**—A person is guilty of aggravated assault if he:
> (1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]

18 Pa.C.S.A. § 2702(a)(1) (bold in original).

"Serious bodily injury" is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301.

In the case *sub judice*, Appellant does not dispute that Henderson suffered serious bodily injury when he was shot in the buttocks and the back of his right leg, resulting in a bullet remaining lodged in his right leg and requiring him to walk with crutches and a cane for six or seven months. Further, Appellant does not dispute he was the person who shot Henderson. However, Appellant contends the Commonwealth failed to prove, beyond a

---

[3] Appellant does not challenge the sufficiency of the evidence as it relates to his remaining convictions.

- 12 -

reasonable doubt, that he acted with the requisite *mens rea* when he shot Henderson. More specifically, he argues there is insufficient evidence establishing he intentionally shot Henderson. In this vein, citing to **Commonwealth v. Fowlin**, 551 Pa. 414, 710 A.2d 1130 (1998), Appellant argues the evidence reveals he shot Henderson, who was a bystander, in the course of shooting Jenkins in self-defense, and thus, he cannot be guilty of aggravated assault. He notes his argument is supported by the fact the jury acquitted him of murder and conspiracy in connection with the shooting death of Jenkins.

> Where, as here, the victim suffered serious bodily injury, the Commonwealth may establish the *mens rea* element of aggravated assault with evidence that the assailant acted either intentionally, knowingly, or recklessly. Looking first to whether evidence established intent to cause serious bodily injury, we note that such an inquiry into intent must be determined on a case-by-case basis. Because direct evidence of intent is often unavailable, intent to cause serious bodily injury may be shown by the circumstances surrounding the attack. In determining whether intent was proven from such circumstances, the fact finder is free to conclude the accused intended the natural and probable consequences of his actions to result therefrom.

**Commonwealth v. Bruce**, 916 A.2d 657, 661 (Pa.Super. 2007) (footnote, citations, quotation marks, and quotation omitted). "Where the intention of the actor is obvious from the act itself, the [fact-finder] is justified in assigning the intention that is suggested by the conduct." **Commonwealth v. Matthew**, 589 Pa. 487, 494, 909 A.2d 1254, 1259 (2006).

In rejecting Appellant's claim, the trial court indicated that, under the appropriate standard of review, the record supports the conclusion that

- 13 -

Appellant intentionally shot Henderson. Trial Court Pa.R.A.P. 1925(a) Opinion, filed 8/7/15, at 16-17. The trial court noted the evidence revealed Appellant shot the decedent in the forehead at close range and then positioned himself to shoot Henderson as Henderson was running away. In this regard, the trial court pointed to Henderson's testimony indicating that "[Appellant] shot Dom point-blank and then as I tried to get away, he shot me." *Id.* at 17 (quoting N.T., 10/9/14, at p. 133).

Moreover, the trial court indicated:

> [Appellant] relies on the. . .holding in *Fowlin* in support of [his] argument. *See Com[monwealth] v. Fowlin*, 710 A.2d 1130, 1131-34 (Pa. 1998) (bystander struck while defendant was acting under reasonable belief that self-defense was necessary). In *Fowlin*, the Court dismissed aggravated assault charges stemming from a gunshot injury to an innocent bystander where the accused, who had simply been sitting at a bar, justifiably fired his gun multiple times at three attackers who had ambushed him, thrown him to the floor, stayed on top of him to continue the attack, maced him to near-blindness, and pointed a gun in his face. "Fearing that he was about to be killed, Fowlin drew his own handgun and fired repeatedly in the direction of the attackers. Although he was nearly blinded by the pepper spray, he killed the assailant who had drawn the gun and wounded one of the others. He also wounded a bystander." *Fowlin*, 710 A.2d at 1131.
>
> The facts of *Fowlin* are readily distinguishable from the case at bar. Henderson was not an unintentionally injured third-party bystander. Henderson testified. . .**"[Appellant] shot Dom point-blank and then as I tried to get away, he shot me."** N.T., 10/9/14, at pp. 131-33[.]
>
> [Viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, Appellant] shot the decedent in the forehead and *then* shot Henderson in the back of the right leg and left buttock. The ballistics evidence established that each of the guns present at the scene were semi-automatic,

- 14 -

meaning that each pull of the trigger fired only one round of ammunition, permitting the jury to distinguish between one shot and the next. The Medical Examiner testified that the single gunshot wound to the decedent's head would have caused the decedent to immediately collapse if standing. Henderson testified that the decedent fell into the car that the decedent was standing next to right after [Appellant] shot him. Given the immediately-evident effect of shooting the decedent in the forehead, it was apparent that [Appellant] did not have to defend himself from anything at that point—the decedent was face down on the ground and Henderson was unarmed, fleeing in the opposite direction. Nevertheless, [Appellant] turned to Henderson and shot him in both the left buttock and the back of the right leg—injuries consistent with the shots having been fired as Henderson was running away from the shooter.

Moreover, the evidence tended to show where [Appellant], Henderson, and the decedent were respectively standing at the time of the shooting. . .that [Appellant] intentionally shot Henderson. Henderson was not *literally* standing "in between" [Appellant] and the decedent as defense counsel repeatedly asserts. Henderson's testimony established that [Appellant], the decedent, and he were essentially standing in a triangle— [Appellant] and the decedent were standing close to each other, face-to-face; and Henderson was facing Dicks Avenue, permitting him to have a clear view of both [Appellant] and the decedent. Based on Henderson's position, [Appellant] would have had to shoot the decedent in the forehead and then re-position the firearm to his far right in order to shoot Henderson in the back of his right leg and buttock.

Henderson was not in the line of fire of [Appellant's] gun when he shot the decedent in the forehead. The decedent was on the ground, and [Appellant] intentionally shot Henderson as he was running away.

Trial Court's Pa.R.A.P. 1925(a) Opinion, filed 8/7/15, at 11-13 (citation omitted) (emphasis in original).

We agree with the trial court's analysis in this regard. Furthermore, we note the fact the jury acquitted Appellant of the crimes of murder and

conspiracy as to Jenkins does not require a finding that the evidence was insufficient as to the aggravated assault of Henderson. As our Supreme Court has held:

> 'An acquittal cannot be interpreted as a specific finding in relation to some of the evidence. As in other cases of this kind, the court looks upon this acquittal as no more than the jury's assumption of a power which they had no right to exercise, but to which they were disposed through lenity.'

*Commonwealth v. Carter*, 444 Pa. 405, 408, 282 A.2d 375, 376 (1971) (quotation omitted).

Additionally, even if we were to assume, *arguendo*, that the two verdicts were logically inconsistent, such inconsistency alone could not be grounds for relief. "It has long been the rule in Pennsylvania and in the federal courts that consistency in a verdict in a criminal case is not necessary." *Carter*, 444 Pa. at 408, 282 A.2d at 376-77 (citations, quotation marks, and quotations omitted). Accordingly, we find Appellant is not entitled to relief on his first or fourth contentions, which challenge the sufficiency of the evidence.

In his second contention, Appellant avers the trial court abused its discretion in failing to tailor its self-defense charge to the jury to fit the "*Fowlinesque* situation." Appellant's Brief at 24. Specifically, Appellant contends the trial court's charge "should have included an instruction informing the jury that if it concluded that Mr. Jenkins was shot in self-defense, then the shooter could not be held criminally liable for aggravated

assault of Lamar Henderson, who was a bystander." ***Id.*** at 27. We find this issue to be waived.

It is well settled that, in order to preserve for appeal a challenge to a jury charge, the appellant must have lodged a specific objection or exception to the jury charge itself. ***Commonwealth v. Pressley***, 584 Pa. 624, 631–32, 887 A.2d 220, 225 (2005). In the case *sub judice*, Appellant failed to make any objections or exceptions to the trial court's jury charge, and, in fact, responded negatively when, at the conclusion of the instruction, the trial court asked if counsel "need[s] to see me about anything?" N.T. 10/15/14, at 165.[4] Accordingly, the issue is waived. ***Commonwealth v. Charleston***, 16 A.3d 505, 527-28 (Pa.Super. 2011) ("Generally, a defendant waives subsequent challenges to the propriety of the jury charge on appeal if he responds in the negative when the court asks whether additions or corrections to a jury charge are necessary.").

In his third contention, apparently recognizing the possibility this Court would find his challenge to the jury instruction to be waived, Appellant

---

[4] Appellant notes that he requested a general charge on self-defense and that the "blame for the deficient instruction on self-defense should be placed on the shoulders of the trial judge." Appellant's Brief at 26. However, under ***Pressley*** and its progeny, Appellant was obligated to object following the jury charge and before the jury retired to deliberate in order to give the trial court an opportunity to correct any mistakes, and his failure to do so results in waiver of the issue on appeal. ***See Pressley***, ***supra***.

alleges that trial counsel was ineffective in failing to object to the trial court's charge.

Our Supreme Court announced in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), that allegations of ineffective assistance of counsel will no longer be entertained on direct appeal. Rather, such claims are to be pursued pursuant to the provisions of the Post–Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. More recently, our Supreme Court reaffirmed *Grant* and held the following:

> By way of summary, we hold that *Grant's* general rule of deferral to PCRA review remains the pertinent law on the appropriate timing for review of claims of ineffective assistance of counsel; we disapprove of expansions of the exception to that rule recognized in *Bomar*;[5] and we limit *Bomar*, a case litigated in the trial court before *Grant* was decided and at a time when new counsel entering a case upon post-verdict motions was required to raise ineffectiveness claims at the first opportunity, to its pre-*Grant* facts. We recognize two exceptions, however, both falling within the discretion of the trial judge. First, we appreciate that there may be extraordinary circumstances where a discrete claim (or claims) of trial counsel ineffectiveness is apparent from the record and meritorious to the extent that immediate consideration best serves the interests of justice; and we hold that trial courts retain their discretion to entertain such claims.
>
> Second, with respect to other cases and claims, including cases such as *Bomar*. . .where the defendant seeks to litigate multiple or prolix claims of counsel ineffectiveness, including non-record-based claims, on post-verdict motions and direct appeal, we repose discretion in the trial courts to entertain such claims, but only if (1) there is good cause shown, and (2) the unitary review so indulged is preceded by the defendant's

---

[5] *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003).

knowing and express waiver of his entitlement to seek PCRA review from his conviction and sentence, including an express recognition that the waiver subjects further collateral review to the time and serial petition restrictions of the PCRA. In other words, we adopt a paradigm whereby unitary review may be available in such cases only to the extent that it advances (and exhausts) PCRA review in time; unlike the so-called **Bomar** exception, unitary review would not be made available as an accelerated, extra round of collateral attack as of right. This exception follows from the suggestions of prior Court majorities respecting review of prolix claims, if accompanied by a waiver of PCRA review.

**Commonwealth v. Holmes**, 621 Pa. 595, 598-99, 79 A.3d 562, 563-64 (2013) (footnote added).

Appellant recognizes these legal precepts and baldly suggests both of the **Holmes** exceptions are applicable to the matter *sub judice* such that this Court is permitted to review his ineffective assistance of counsel claim on direct appeal. **See** Appellant's Brief at 27-28.

In its Pa.R.A.P. 1925(a) opinion, the trial court noted, in relevant part, that "[n]either of the two exceptions to the general rule of deferring ineffective assistance of counsel claims until PCRA review articulated in **Holmes** is applicable here." Trial Court Pa.R.A.P. 1925(a) Opinion, filed 8/7/15, at 15 (citation and footnote omitted). We agree with the trial court and, accordingly, defer Appellant's ineffective assistance of counsel claim to collateral review.[6]

_____

[6] It bears mentioning that, in his post-sentence motion and court-ordered Pa.R.A.P. 1925(b) statement, Appellant raised the instant ineffective

*(Footnote Continued Next Page)*

For all of the foregoing reason, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/4/2016

---

*(Footnote Continued)*

assistance of counsel claim; however, he made no assertion regarding the ***Holmes*** exceptions. Moreover, aside from baldy suggesting he is entitled to the ***Holmes*** exceptions, he has not developed the assertion on appeal. In any event, we agree with the trial court that the exceptions are not applicable in the case *sub judice*.