J-S32019-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| JUSTIN ROBERT UNDERKOFFLER | : | |
| | : | |
| Appellant | : | No. 92 MDA 2023 |

Appeal from the Judgment of Sentence Entered January 11, 2023
In the Court of Common Pleas of Schuylkill County Criminal Division at
No(s):  CP-54-CR-0001582-2021

BEFORE:  DUBOW, J., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY KUNSELMAN, J.:          **FILED: NOVEMBER 14, 2023**

### I.      Introduction

After a jury convicted him of illegally possessing a gun,[1] Justin Robert Underkoffler appeals from the judgment of sentence imposing three to seven years' incarceration.  Underkoffler contends the state trooper who arrested him used an unconstitutional, two-step-interrogation procedure.  When the trooper first confronted Underkoffler and his father, the trooper extensively questioned them.  After they confessed, he read them the **Miranda**[2] warnings, in his words, "just to make this formal."  Commonwealth's Ex. 1 at 26:34 – 26:36.  Underkoffler restated his confession.  As we discuss, many appellate courts across this country would potentially suppress the restated confession. **See** Note 9, **infra**.  However, a prior panel of this Court has already rejected Underkoffler's Fifth Amendment argument.  Thus, we affirm.

---

[1] **See** 18 Pa.C.S.A. §§ 6105(c)(1) and 6106(a)(1).

[2] **See Miranda v. Arizona**, 384 U.S. 436 (1966)

## II.   Factual & Procedural Background

The Pennsylvania State Police ("PSP") had obtained arrest warrants for Underkoffler.  Aware of those warrants, on the afternoon of June 28, 2021, a state trooper drove past Underkoffler's last known location, a residence in Schuylkill County.  Looking out the window of his unmarked car, the trooper saw Underkoffler "walking towards a dark-blue, Chevy Trailblazer" SUV parked in the home's driveway.  N.T., 3/18/22, at 7.  The trooper did a U-turn and pulled into a neighboring driveway, located a few hundred feet from the Underkoffler property.

The trooper waited there for a few seconds and checked a database to confirm that Underkoffler's warrants remained in effect.  Soon, the blue SUV drove onto the street.  When it immediately stopped in the road and forced a car following it to pass in the opposing lane of traffic, the trooper (who was in uniform) inferred the driver of the SUV had seen him.  **See id.**  The SUV then headed back into the driveway from which it had just departed.

The trooper activated his lights, drove into the driveway, and blocked-in the SUV.  As recorded on the patrol-car-dashboard camera, the driver and the trooper exited their vehicles.  They met near the rear bumper of the SUV.  **See** Commonwealth's Ex. 1 at 1:08.  The trooper asked the driver, "Hey, is Justin [Underkoffler] here?"  **Id.** at 11:11.

The driver shook his head and said, "No, huh-uh."  **Id.** at 1:12.

"Oh, okay.  I thought you were him in the [SUV] pulling out.  Are you [his] dad?"  **Id.** at 1:13 - 1:17.

"Yeah.  Yeah," the driver said.  ***Id.*** at 1:17.

"Alright, you look like him.  He's not here, though?" ***Id.*** at 1:18-1:19.

The father said, "No, no, not that I see," and laughed nervously.  ***Id.*** at 1:20. They momentarily discussed an incident from the night before, in which the PSP responded to a 911 call, regarding the discharge of firearms.  Troopers had come to the property to look for Underkoffler, but they could not find him.

"He's not in your car or anything, right?" ***Id.*** at 2:10 – 2:12.  The father nervously laughed and replied, "There, there, there - - There's a guy in there. It's not - -" ***Id.*** at 2:15 – 2:18.  He trailed off as the trooper peered through the window of the SUV.

"That's him!" the trooper declared.  ***Id.*** at 2:19.  He walked to the other side of the SUV, opened the door, and handcuffed Underkoffler.  ***See id.*** at 2:20 – 2:29.

Underkoffler immediately asked, "What do I have a warrant for though?" ***Id.*** at 2:31.  The trooper explained that his arrest warrants were for drugs, and he permitted Underkoffler to smoke a cigarette.  ***See id.*** at 2:32 – 3:00.

"You don't have anything illegal on you, right?" the trooper asked.  ***Id.*** at 3:13 – 3:14.

Underkoffler said, "No, no, no; you can search me if you want." ***Id.*** at 3:15 – 3:18.  The trooper then returned to his car and radioed headquarters to notify other troopers that he had Underkoffler in custody.  ***See id.*** at 3:20 – 5:10.  Also, the trooper learned that the father had a suspended license.

When he confronted the father with that fact, father said, "Yeah, I know - - I just - - All's I did is - - I just wanted to make sure his trany was working right." *Id.* at 5:16 – 5:20.

The trooper then asked Underkoffler, "So what was the deal yesterday with you shooting a gun back here?" *Id.* at 7:16 – 7:20.

Underkoffler, still sitting in the front seat of the SUV, handcuffed, and smoking his cigarette, said, "Yeah -- oh, yeah, I was shooting a gun, yeah. That's all. It was my uncle's . . . Yeah, they're all his guns. Yeah." *Id.* at 7:21 – 7:29.

"What's your criminal history like, though?" the trooper asked. *Id.* at 7:30 – 7:32.

"Oh, I have - - I have no felonies. No felonies, no felonies at all, yeah, I'm a [inaudible] guy; I have two kids. I try to do what's right." *Id.* at 7:33 – 7:38.

The trooper inquired, "What drugs did you get caught with? Was it meth?" *Id.* at 7:39 – 7:40.

"I had a little bit of meth, yeah. Yeah, I was - - I was an addict. Well, I do - - I'm still an addict, but not . . . like I was, but I was way worse. I used to be addicted to dope, because . . . ." *Id.* at 7:41 – 7:49. The trooper interrupted Underkoffler and asked him to walk over to the hood of the patrol car. He searched Underkoffler and found nothing illegal on him. *See id.* at 7:50 – 8:47.

They then moved to the driver's side of the patrol car, which placed the trooper and Underkoffler off camera. The trooper said, "Now, I want you to be honest, because, obviously, you guys saw me. You backed right up; I'm not stupid, alright? You obviously saw me sitting over there; as soon as you saw me, you stopped right in the middle of the road." *Id.* at 8:48 – 8:56.

Underkoffler replied, "No, I honestly didn't. No, no, I didn't. I swear to God, I didn't see you. Believe me, Your Honor, I wouldn't do that; I wouldn't wanna be on your shit list." *Id.* at 8:57 – 9:00. He laughed nervously.

The trooper asked, "Is there anything illegal in the car, right now?" *Id.* at 9:01 – 9:02.

"No, nothing, I'm sure; I swear," Underkoffler said. *Id.* at 9:02 – 9:04.

"The other issue is, technically, you shouldn't be possessing a firearm when you have warrants, but . . . ." *Id.* at 9:18 – 9:20.

"Awe, I didn't know that. I thought you were still allowed to shoot," Underkoffler said. *Id.* at 9:21 – 9:24.

"Yeah, you're technically a fugitive." *Id.* at 9:25.

"Oh, really? See, I - - I never even knew that." *Id.* at 9:26 – 9:27.

The trooper asked, "Any guns in the car, right now?" *Id.* at 9:28 – 9:29.

"No. Just my uncle's." *Id.* at 9:29.

"Is it in the car?" *Id.* at 9:31.

Underkoffler said, "No, no, ah - - the AK got taken out. Actually, it's over there, actually." *Id.* at 9:32 – 9:35. "It's hung up, yeah; it's hung up,

yeah, yeah. Then, uh - - just uh - - uh, the - - the, uh - - he had a handgun."
*Id.* at 9:36 – 9:41.

"Is it in the car?" the trooper pressed. *Id.* at 9:42.

"Yes, it's in the car, in a bookbag." *Id.* at 9:42 – 9:43.

"Who's it belong to?" *Id.* at 9:44.

"Uh - - it's my - - my uncle, my uncle's, but it's actually his friend's."
*Id.* at 9:44 – 9:46. "He, he, he - - you can call him; he, he can verify that
he, he, he uses it, cause he left it at the house. He was - - you know - - he
left it here, actually. He was shooting here yesterday, too." *Id.* at 9:47 –
9:54. Underkoffler laughed nervously.

"Where's the gun at in the car, right now?" *Id.* at 9:56 – 9:58.

"Uh - - um, just open door, there's a backpack. In the first zipper part,
in there." *Id.* at 9:59 – 10:04.

The trooper then called the father over and related that Underkoffler
had said there was a gun in the SUV. The father answered, "Oh, yeah, they
were shooting." *Id.* at 10:27.

"Who does that belong to?" the trooper asked. *Id.* at 10:28 – 10:29.

"Um - - I think, I think it's Mark's," the father replied. *Id.* at 10:30 –
10:31.

"Who's that?" *Id.* at 10:32.

"Mark Allya." *Id.* at 10:33.

"Do either of you guys have a permit to carry a firearm?" *Id.* at 10:34
– 10:36.

"I don't. I don't have permit, no. I don't have no guns at all," the father said. *Id.* at 10:36 – 10:39.

The trooper asked, "What's your record look like?" *Id.* at 10:40.

"I don't have no felonies or nothing," the father said. *Id.* at 10:41.

"No felonies? Okay. Is this [SUV] your car?" *Id.* at 10:41 – 10:44.

"Yeah, it's mine." *Id.* at 10:45.

"Okay. Who came in possession of the gun?" *Id.* at 10:49 – 10:51.

Father pointed at himself and said, "Well, actually - - I've - - I've had it. Mark's in jail. I mean, this - - this is his trailer. I brought his trailer out here. I brought his car [inaudible] out here. He's getting a pre-release; he should be released this week, so - - I have a bunch of his stuff at my house." *Id.* at 10:52 – 11:07.

The trooper replied, "Well, just hang out by your bumper here. Stay off your phone, until I figure out, because now I got an issue with the gun . . . in the car . . . because you guys don't have a permit to carry. And he's a fugitive, because he's got warrants. So just hang tight, here; I don't want everybody walking around. Is it your car, then?" *Id.* at 11:08 – 11:18.

The father answered, "Yeah, it's in my name." *Id.* at 11:19.

"Who - - who does the backpack belong to that the gun's in?" *Id.* at 11:20 – 11:22.

Pointing to Underkoffler, the father said, "I guess Justin; I don't know." *Id.* at 11:26 – 11:28.

Next, the trooper returned to his patrol car and radioed headquarters. He related that firearms were present and requested backup. As the trooper waited for backup, Underkoffler said, "I mean, Jamie was here. Big Kevin was here; it's his gun." *Id.* at 12:38 – 12:43.

This prompted the trooper to reemerge from the patrol car and resume the interrogation. He said to Underkoffler, "Here's the problem, alright? You guys have a firearm . . . You guys have a firearm concealed in the [SUV]. You don't have a permit to carry, either, right?" *Id.* at 12:44 – 12:52.

Underkoffler said, "My uncle does, yes." *Id.* at 12:53.

"Well, your uncle's not here, though," the trooper replied. *Id.* at 12:54.

"Yes, he is; my uncle *was* here." *Id.* at 12:55 – 12:56 (emphasis in original).

"He's not in the vehicle with you guys." *Id.* at 12:57.

"Well, well, that's supposed to go in the house; I'm sorry. It's supposed to be in the house," Underkoffler pleaded. *Id.* at 12:58 – 13:03.

"Either way, [911] got called yesterday for you shooting a gun. *You, specifically*, shooting a gun," the trooper explained. *Id.* at 13:03 – 13:05 (emphasis in original).

"We all were. We all were," Underkoffler said. *Id.* at 13:06.

"Either way, you have the charges; you're a fugitive. Okay? Cause you got a warrant." *Id.* at 13:07 – 13:10.

"Okay, I understand. I didn't know that." *Id.* at 13:11 – 13:12.

The trooper said, "Wait until the backup gets here; we'll deal with it then. What's your - - What's Mark in jail for?" *Id.* at 13:13 – 13:16.

The father answered, "Oh, oh, it wasn't his. No, no - - I didn't know - - I didn't, I didn't know there was a gun in there." *Id.* at 13:17 – 13:22.

Underkoffler added, "And Jamie's in there. I mean, he has his permit. He was shooting with me yesterday! He left the gun here, cause he was gonna come back today!" *Id.* at 13:23 – 13:30.

The trooper said, "Well, you guys still can't just drive around with a gun in the car . . . ." *Id.* at 13:31 – 13:32.

"Oh, I wasn't driving around," the father said. *Id.* at 13:33. "I was just making sure the trany was working." *Id.* at 13:34 – 13:35.

"Ah, come on," the trooper replied, "as soon as I pulled out, you pulled right down here, as soon as you saw me. I saw you stop in the middle of the road. You went right down the driveway; the car passed you on the left." *Id.* at 13:36 – 13:41.

At that point, backup arrived, and the trooper explained the situation to the new trooper. Next, he asked the father for permission to search the SUV; the father consented. *See id.* at 14:08 – 14:10.

The trooper opened the rear-passenger door; unzipped Underkoffler's backpack; removed a handgun; and held it up. He asked Underkoffler, "This the gun, then?" *Id.* at 14:32.

Underkoffler said, "Yeah, yeah - - That's, yeah." *Id.* at 14:33 – 14:34.

The trooper opened the chamber and found a bullet inside. He also found two loaded magazines in the backpack. The trooper then turned back to Underkoffler and asked, "So you're saying this is your backpack, then, right? This is his gun?" *Id.* at 15:10 – 15:13.

"Yeah, that's – That's my backpack, but that's definitely his gun." *Id.* at 15:14 – 15:15.

A few minutes later, the trooper said to Underkoffler, "Well, here's the problem, man: like I said, 'You're a fugitive.' You're carrying a gun around, concealed in a vehicle, and neither of you guys have a permit. Alright? So [the gun is] going with me, and you're getting new charges." *Id.* at 17:48 – 17:57.

"Are you serious?" Underkoffler asked. *Id.* at 17:58.

"Yeah, I'm serious; [troopers were] out here yesterday dealing with you shooting outback, and you take off." *Id.* at 17:59 – 18:06.

"I wasn't the only one shooting." *Id.* at 18:07.

"Doesn't matter," the trooper said. *Id.* at 18:08. "You're still driving around with a gun in your backpack. And you got one in the chamber." *Id.* at 18:09 – 18:11.

Underkoffler began to cry and yelled, "Awe fuck, man! They're giving me gun charges for shit I didn't even know was in the bookbag." *Id.* at 18:16 – 18:22.

The trooper said, "Alright, don't do anything crazy. Alright?" *Id.* at 18:23 – 18:25.

Sobbing, Underkoffler answered, "I'm not.  Don't worry, man.  It's crazy, man."  *Id.* at 18:26 – 18:28.

"I'm sure these [other troopers] don't want to be out here, every day, dealing with you; that's the problem, man.  Especially, when it involves a gun."  *Id.* at 18:29 – 18:33.  "It's one thing if you're shooting, I mean, technically, you can't even possess a firearm right now, because you're a fugitive, right?  Because of the warrant."  *Id.* at 18:39 – 18:41.

"And I didn't know that.  I didn't know that!"  *Id.* at 18:42 – 18:44.

"Well, I understand that, but, at the same time, you can't conceal a firearm in a vehicle – Alright? – without a permit to carry."  *Id.* at 18:44 – 18:47.

Underkoffler said, "I didn't know it was - - I didn't know it was in my bookbag!"  *Id.* at 18:46 – 18:48.

The trooper walked back to the SUV to continue the vehicle search.  Still crying, Underkoffler said, "I'm never gonna get to see my fucking kids, ever."  *Id.* at 19:08 – 19:10.  The trooper allowed Underkoffler's father to give him a new cigarette.  *See id.* at 20:10.  The search revealed no other illegal items.  *See id.* 20:15 – 21:00.

Openly weeping, Underkoffler said, "I didn't know there was nothing in there!"  *Id.* at 21:01.

The trooper walked back to him and said, "Do you understand the issue, though?  You know what I mean?"  *Id.* at 21:09 – 21:10.

"I do understand, and I . . . I didn't know it was - - " Underkoffler trailed-off into unintelligible sobs. *Id.* at 21:10 – 21:13.

"Well, you obviously knew it was in there. You told me right where it was," the trooper said. *Id.* at 21:13 – 21:14.

"I knew it was in my bookbag, and I just threw it back there, and then I forgot about it. I'm sorry." *Id.* at 21:14 – 21:19.

The trooper asked, "What have you been charged with before? What's your history like?" *Id.* at 21:37 – 21:40. Both Underkoffler and his father claimed to have no felonies. The trooper said, "I just want to check that one." *Id.* at 21:47 – 21:49. After doing some research on his in-car computer, he told the father, "You got a felony drug conviction." *Id.* at 25:14 – 25:15.

"No, I have no felonies," father responded. *Id.* at 25:16 – 25:18.

"From '95," the trooper said. *Id.* at 25:18.

The father shook his head and said, "It wasn't a felony." *Id.* at 25:19 – 25:20.

"It says you're convicted, pled guilty to it." *Id.* at 25:21 – 25:22. "Ugh, you guys are killing me, here . . . It says an (a)(30), which is Possession with Intent to Deliver, pled guilty. Alright?" *Id.* at 25:24 – 25:34.

About a minute later, the trooper again exited his patrol car and said, "Alright, just to make this formal - - if you [father] want to come over here, too. Listen up." *Id.* at 26:34 – 26:41. He removed a piece of paper from his pocket and told father, "I'm not gonna put you in cuffs or anything, but I am gonna read both of you guys your rights." *Id.* at 26:42 – 26:46. The trooper

then quickly recited the warnings required under ***Miranda v. Arizona***, 384 U.S. 436 (1966).

He asked, "You guys both understand your rights?" ***Id.*** at 27:00. The father nodded yes, but Underkoffler, standing off camera, did not answer. Thereafter, the trooper pointed to the father and said, "So, you're a felon . . . it's in your criminal history." ***Id.*** at 27:01 – 27:09. He next pointed to Underkoffler and said, "You got the warrant, alright? So, who's responsible for this firearm right now?" ***Id.*** at 27:10 – 27:12.

Underkoffler confessed: "It was me . . . I just threw it in my bookbag and just threw it in there [*i.e.*, the SUV]." ***Id.*** at 27:13 – 27:22.

The trooper seized the handgun and the ammunition, and he charged Underkoffler with various firearm violations. Underkoffler filed a motion to suppress the physical evidence and the statements he made to the trooper.

Following a hearing, the suppression court issued an Opinion and Order regarding its findings of fact and conclusions of law. The court ruled that the statements Underkoffler made prior to the trooper's recitation of the ***Miranda*** warnings were inadmissible at trial. In all other respects, it denied the motion.

The case proceeded to trial. A jury convicted Underkoffler, and the trial court entered an amended judgment of sentence on January 11, 2023.

The day prior to the entry of the amended sentence, despite having legal representation, Underkoffler drafted and mailed a *pro se* notice of appeal to this Court and the trial court. This Court received and docketed the appeal on January 13, 2023. ***See*** Notice of Appeal at 1. The trial court docketed it on

January 18, 2023. Defense counsel did not file a separate notice of appeal on Underkoffler's behalf.

The trial court issued a *sua sponte* order dismissing Underkoffler's notice of appeal. **See** Trial Court Order, 1/18/23, at 1. It reasoned that, because the Office of the Public Defender of Schuylkill County represented (and still represents) Underkoffler, "the *pro se* request [*i.e.*, the notice of appeal] is inappropriate . . . ." **Id.** (citing **Commonwealth v. Pursell**, 724 A.2d 263 (Pa. 1999) and **Hall v. Dorsey**, 534 F. Supp. 507 (E.D. Pa. 1982) (both holding that a defendant is not entitled to "hybrid" representation by counsel and by himself)). Thus, the trial court quashed Underkoffler's *pro se* notice as being a legal nullity. By quashing, the trial court essentially asserted that this case remained pending in its original jurisdiction, rather than proceeding to our appellate jurisdiction.

### III.   Analysis

### A.    Our Appellate Jurisdiction

In light of the trial court's order of quashal, we must decide whether we have jurisdiction to entertain Underkoffler's appeal. The order raises the issue of whether a *pro se* notice of appeal vests appellate jurisdiction in this Court, where, as here, a defendant has legal counsel at the time of the *pro se* filing.

"Jurisdiction presents us with a purely legal issue, for which our standard of review is *de novo*, and our scope of review is plenary; we may consider the issue of jurisdiction *sua sponte*." **Commonwealth v. Pi Delta Psi, Inc.**, 211

A.3d 875, 880 n.3 (Pa. Super. 2019), *appeal denied*, 211 A.3d 875 (Pa. 2019) (some punctuation omitted).

The Supreme Court of Pennsylvania has held, "timeliness of an appeal and compliance with the statutory provisions granting the right to appeal implicate an appellate court's jurisdiction and its competency to act." ***Commonwealth v. Williams***, 106 A.3d 583, 587 (Pa. 2014). An "appellant's failure to appeal timely an order generally divests the appellate court of its jurisdiction to hear the appeal." ***Id.*** "In a criminal case, in which no post-sentence motion has been filed, the notice of appeal shall be filed within 30 days of the imposition of the judgment of sentence in open court." Pennsylvania Rule of Appellate Procedure 903(c)(3).

Also, Pa.R.A.P. 902 "stipulates that failure of an appellant to take any step ***other than the timely filing*** of a notice of an appeal does not affect the validity of the appeal." ***Id.*** (emphasis added). This wide latitude extends to a *pro se* notices of appeal filed by counseled defendants.

We have said, because "a notice of appeal protects a constitutional right, it is distinguishable from other filings that require counsel to provide legal knowledge and strategy in creating a motion, petition, or brief." ***Commonwealth v. Williams***, 151 A.3d 621, 624 (Pa. Super. 2016) ("***Williams II***"). Thus, "this Court is required to docket a *pro se* notice of appeal, despite [an] appellant being represented by counsel, based on [Operating Procedure of the Superior Court] 65.24." ***Id.*** That O.P., governing hybrid representation, dictates, "A *pro se* notice of appeal received from the

trial court shall be docketed, even in instances where the *pro se* [appellant] was represented by counsel in the trial court." O.P. 65.24, Except. 1.

Hence, Underkoffler's *pro se* notice of appeal perfected the appellate jurisdiction of this Court, notwithstanding that it was hybrid representation. ***See Williams II***, ***supra***. Even though the trial court correctly identified the notice of appeal as hybrid representation, its order quashing the *pro se* notice of appeal was an error of law.

Therefore, we vacate the January 18, 2023 order of quashal and proceed to the merits of Underkoffler's appeal. He raises two issues as follows:

1. Whether the [suppression court] committed an error of law in ruling on [Underkoffler's] pretrial motion that there was reasonable suspicion for the traffic stop of the [SUV?]

2. Whether the [suppression court] committed an error of law in allowing any evidence of [Underkoffler's] statements to be introduced at trial, due to the fact that they were obtained in violation of his constitutional rights?

Underkoffler's Brief at 4. We address each issue in turn.

## B.    The Trooper's Entrance onto the Property

First, we address Underkoffler's claim that the suppression court erred by holding that the trooper had reasonable suspicion, sufficient to justify a traffic stop of the SUV. He contends the trooper executed a traffic stop under Pennsylvania Vehicle Code, 72 Pa.C.S.A. § 630(b), and that that section required the trooper to articulate "reasonable suspicion that a violation of this title is occurring or has occurred . . . ." ***Id.*** at 10 (quoting 72 Pa.C.S.A. §

639(b)). Underkoffler believes reasonable suspicion was lacking. *See id.* at 13.

In this case, however, whether the trooper had reasonable suspicion to stop the SUV is moot,[3] because his authority to enter the Underkoffler property derived from another, unrelated source. Instead of needing to articulate facts that reasonably lead him to believe crime was afoot or that a violation of the Vehicle Code may have occurred, the trooper had two warrants for Underkoffler's arrest. Thus, the trooper was not acting unilaterally; he had prior, judicial authorization to enter the property.

It is black-letter law that "An arrest warrant and 'reason to believe' that a suspect can be found on the premises are sufficient for police to forcibly enter the premises, whether they are the suspect's own home or the premises of a third party . . . ." 26 STANDARD PA PRACTICE 2d. §132:381 at 640 (2019) (citing **Commonwealth v. Felie**, 581 A.2d 636 (Pa. Super. 1990), *appeal denied*, 597 A.2d 1151 (Pa. 1991)); **see also Commonwealth v. Stanley**, 446 A.2d 583, 587 (Pa. 1982). Surely, this power of forcible entry extends to the yard and any vehicle parked in the premises' driveway, wherein a wanted individual might be hiding.

_____

[3] Mootness is a "pure question of law, and therefore this Court's standard of review is *de novo*, and our scope of review is plenary." **Commonwealth v. Dixon**, 907 A.2d 468, 472 (Pa. 2006). "An issue before a court is moot when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy." **Crespo v. Hughes**, 292 A.3d 612, 617 (Pa. Super. 2023).

Here, the trooper recognized Underkoffler as he walked towards the SUV parked in the premises' driveway. The trooper took a few moments to confirm that the warrants for Underkoffler's arrest were still active. When the database indicated that Underkoffler remained a fugitive, the trooper had authority to enter the property, to search for Underkoffler, and to apprehend him, because he had (1) a warrant for Underkoffler's arrest and (2) reason to believe Underkoffler was located either on the property or in the SUV. **See Felie**, **supra**. Armed with warrants of arrest, the trooper not only had license from the courts to enter the property, but judicial orders to do so and to apprehend Underkoffler.

Moreover, the Constitution provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation. . ." U.S. Const. amend. IV. Notably, Underkoffler never alleged that either of the two warrants for his arrest lacked probable cause in their supporting affidavits.

"Pennsylvania Rule of Criminal Procedure 581(D) requires that a motion to suppress state specifically and with particularity the evidence sought to be suppressed, *the grounds for suppression*, and the facts and events in support thereof." **Commonwealth v. Banks**, 165 A.3d 976, 980 (Pa. Super. 2017) (quotation omitted) (emphasis in original). Because Underkoffler did not attack the legitimacy of the two warrants in his motion to suppress, he has waived any potential defect or claim of unconstitutionality in those warrants.

Thus, whether the suppression court erred by ruling that the trooper had reasonable suspicion for a traffic stop is moot, because the trooper instead met the highest of constitutional tests for invading someone's privacy. He "g[o]t a warrant." **Riley v. California**, 573 U.S. 373, 403 (2014). In fact, his entry onto the Underkoffler property was doubly constitutional, because he possessed two warrants.

Hence, we dismiss Underkoffler's first issue as moot.

## C. Underkoffler's Confession

Finally, we turn to the trooper's interrogation of Underkoffler and his post-**Miranda**-warnings confession. Underkoffler urges that the suppression court erred by failing to suppress all of the inculpating statements that he made in the dashboard video, including those given after the trooper read him the **Miranda** warnings. To support this position, he relies exclusively upon **Missouri v. Seibert**, 542 U.S. 600 (2004) (Souter, J., Plurality Opinion Announcing the Judgment in Support of Affirmation). **See** Underkoffler's Brief at 14-17. Based on the lead opinion from **Seibert**, Underkoffler contends the trooper's question-first-give-**Mirada**-warnings-second interrogation violates the Fifth Amendment to the Constitution of the United States.

This Court has held "whether a confession is constitutionally admissible is a question of law . . . ." **In re B.T.**, 82 A.3d 431, 435 (Pa. Super. 2013) (some punctuation omitted). As such, our standard of review is *de novo*. **See id.** Even so, our "scope of review is limited to considering only the evidence of the prevailing party at the suppression hearing and so much of the evidence

of the non-prevailing party as remains uncontradicted when read in the context of the suppression record." **Commonwealth v. Pacheco**, 263 A.3d 626, 639 (Pa. 2021) (citing **In re L.J.**, 79 A.3d 1073, 1080 (Pa. 2013)).

The Fifth Amendment commands, in relevant part, that "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

To effectuate that constitutional provision, the Supreme Court of the United States has explained that, once in police custody,[4] "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." **Miranda**, 384 U.S. at 467. Thus, the High Court held an arrested individual "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." **Id.** at 479.

"Opportunity to exercise these rights must be afforded to him throughout the interrogation." **Id.** "After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement."

---

[4] The parties agree that Underkoffler was in custody throughout the trooper's interrogation.

When officers give the *Miranda* warnings prior to questioning suspects, whether inculpatory statements made thereafter are admissible at trial is an inquiry that:

> has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived.

*Int. of N.M.*, 222 A.3d 759, 772 (Pa. Super. 2019). Thus, if the apprehended suspect knowingly and voluntarily waived the Fifth Amendment right to remain silent, then the prosecution may use the confession in its case-in-chief.

Determining whether there was a true waiver becomes more complicated when law enforcement performs a two-step interrogation by first questioning the suspect and then reading the *Miranda* warnings. One might well wonder what good are the warnings to the suspect *after* police have obtained a full confession. Is the subsequent reiteration of the confession truly knowingly and voluntarily made?

The Supreme Court of the United States first faced the dilemma of two-step interrogations in *Oregon v. Elstad*, 470 U.S. 298 (1985). That case involved an officer who casually elicited a single, inculpatory statement from a teenage suspect, prior to the *Miranda* warnings, while the suspect sat in his living room and police explained the situation to his mother. After taking

- 21 -

the teenager to the station and reading the *Miranda* warnings to him, the officers obtained a full confession. The *Elstad* Court determined that the trial court properly admitted the post-warnings confession into evidence.

The High Court said, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" with respect to the second statement. *Id.* at 314. "The relevant inquiry is whether, in fact, the second statement was also voluntarily made" and, "[a]s in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Id.* at 318. The Supreme Court held that the "subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.* at 314.

With these precedents in mind, we turn to the case that Underkoffler would have us apply: *Seibert*, *supra*. There, Patrice Seibert's twelve–year–old son, Jonathan, who had cerebral palsy, died in his sleep. Seibert feared charges of neglect, because Jonathan had bedsores on his body.

In her presence, two of her teenage sons and two of their friends devised a plan to conceal the facts surrounding Jonathan's death by burning down the family's mobile home and incinerating his body. To avoid any appearance that Jonathan had been neglected, they also planned to sedate a mentally ill

teenager who lived with the family and leave him inside the home. Seibert's son and a friend set the fire, and the mentally ill teenager died. *Seibert*, 542 U.S. at 604. Seibert was charged with first-degree murder for her role in the teenager's death.

The officer who arrested Seibert conducted a two-step interrogation. Following his local department's policy, the officer deliberately withheld the "*Miranda* warnings until after interrogating and drawing out a confession." *Id.* at 609. At the suppression hearing, the officer admitted the "interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'" *Id.* at 606. "Seibert's ultimate statement was largely a repeat of information obtained prior to the warning." *Id.*

The Missouri trial court suppressed the statements that Seibert made prior to receiving *Miranda* warnings, but it refused to suppress the reiterated confessions that followed the warnings. The court found that she voluntarily gave the post-warning statements. The "Missouri Court of Appeals affirmed, treating this case as indistinguishable from *Oregon v. Elstad*, [*supra*] . . . ." *Seibert*, 542 U.S. at 606.

The Supreme Court of Missouri reversed and ordered suppression of the post-warning confession. According to the state supreme court, because "the interrogation was nearly continuous . . . the second statement, clearly the product of the invalid first statement, should have been suppressed." *State v. Seibert*, 93 S.W.3d 700, 701 (Mo. 2002) (*en banc*). The court concluded

*Elstad* did not apply, because, in *Elstad*, the officer briefly and casually spoke with the suspect in his home, prior to the real interrogation at the police station. By contrast, the officer in *Seibert* intentionally omitted the warnings "to deprive Seibert of the opportunity knowingly and intelligently to waive her *Miranda* rights." *Id.* at 706. Because there were "no circumstances that would seem to dispel the effect of the *Miranda* violation," the Supreme Court of Missouri held the post-warning confession was involuntary and therefore inadmissible. *Id.* In that court's view, giving the police an "end run" around *Miranda* would encourage *Miranda* violations and weaken its protections against self-incrimination. *Id.* at 706–07.

The Supreme Court of the United States granted certiorari to resolve the split of authority on the issue. *See Seibert*, 542 U.S. at 607. Regrettably, the Justices were unable to reach a consensus. While five Justices agreed with the Supreme Court of Missouri that the two-step-interrogation procedure was unconstitutional, they failed to agree on the test for determining when such an interrogation would be invalid.

In his lead opinion in support of affirmation, Justice Souter insisted on the use of a multiprong test, which Underkoffler urges us to apply.[5] Writing

_____

[5] Justice Souter articulated five factors for courts to consider when evaluating a two-step interrogation and deciding whether a post-warning statement is admissible:

  1)   completeness and detail of the questions and answers in the
        first round of interrogation;

*(Footnote Continued Next Page)*

separately, Justice Kennedy agreed with the judgment that the post-warning statement was inadmissible, but he employed a different test. He examined the officers' purpose for conducting the two-step interrogation. Because the officer desired to evade *Miranda*, Justice Kennedy imposed the sanction of suppressing the post-warning statements.[6]

In her dissenting opinion, Justice O'Connor would have adopted the approach of the Missouri Court of Appeals and the trial court to hold that *Elstad*, *supra*, controlled the case. She explained that, under *Elstad*, the proper inquiry is whether, despite the two-step interrogation, the post-warnings statements were, in fact, still voluntarily given.[7]

Several years following the Supreme Court decision in *Seibert*, this Court was faced with a constitutional challenge to a two-step interrogation in *Commonwealth v. Charleston*, 16 A.3d 505, 525 (Pa. Super. 2011), *partially abrogated on other grounds by In re L.J.*, *supra*. After thoroughly examining the writings by the Justices in *Seibert* (and the decisions of the

---

2)     overlapping content of the two statements;

3)     timing and setting of the first and the second interrogations;

4)     continuity of police personnel; and

5)     degree to which the interrogator's questions treated the second round as continuous with the first.

*See Missouri v. Seibert*, 542 U.S. 600 at 615 (2004) (plurality).

[6] Oddly, Justice Breyer seemingly agreed with the approaches of both Justices Souter and Kennedy, even though they appear mutually exclusive.

[7] Justice O'Connor wrote *Oregon v. Elstad,* 470 U.S. 298 (1985).

federal, circuit courts thereafter), we held that nothing announced therein was controlling law. "*Seibert* establishes no new binding precedent, and therefore, this Court is bound by the precedent established by the Pennsylvania Supreme Court in *Commonwealth v. DeJesus*, [787 A.2d 394 (Pa. 2001)] which followed *Elstad's* focus on the knowingness and voluntariness of the waiver in cases where coercion is absent." Thus, we rejected an appellant's request to adopt the multiprong test of Justice Souter in *Seibert*.[8]

As a result, Pennsylvania currently follows Justice O'Connor's dissent and the reverse approach of the Missouri Court of Appeal in *Seibert*. When an officer in this Commonwealth conducts a two-step interrogation and obtains

_____

[8] Ultimately, in applying *DeJesus* and *Elstad* to the facts in *Charleston*, we concluded that the appellant failed to demonstrate a violation of the Fifth Amendment. *Commonwealth v. Charleston*, 16 A.3d 505, 525-526 (Pa. Super. 2011), *partially abrogated on other grounds by In re L.J.*, 79 A.3d 1073 (Pa. 2013). On appeal, the appellant did not argue that his first statement was coerced. He focused on the circumstances of the interrogation and claimed that, because there was no break in the events or any curative measures taken after he gave the unwarned statement, the subsequent warned statement was inadmissible. However, our analysis hinged upon whether his post-warning statement was a knowing and voluntary waiver. *Id.* at 526.

We observed that from the beginning of the detective's interaction with appellant on the morning in question, appellant was "immediately receptive" and was "very cooperative and eager to give his portion of the story." *Id.* During the interrogation, he was permitted to use a restroom and was given a sandwich and something to drink. *Id.* Under those circumstances, we had held that appellant's waiver of his rights and the subsequent statement were both knowing and voluntary. *Id.*

inculpatory statements from a suspect prior to giving the **_Miranda_** warnings, pre-warnings statements are *per se* inadmissible. Nevertheless, the post-warnings statements are admissible provided they comport with **_Elstad_**.

As Justice O'Connor explained:

> **_Elstad_** commands that if [a suspect's] first statement is shown to have been involuntary, the court must examine whether the taint dissipated through the passing of time or a change in circumstances: "When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." **_Id._** at 310, 105 S.Ct. 1285 (citing **_Westover v. United States_**, decided with **_Miranda_**, 384 U.S., at 494, 86 S.Ct. 1602). In addition, [the suspect's] second statement should be suppressed if she showed that it was involuntary despite the **_Miranda_** warnings. **_Elstad, supra_**, at 318, 105 S.Ct. 1285 ("The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements").
>
> Although I would leave this analysis for the Missouri courts to conduct on remand, I note that, unlike the officers in **_Elstad_**, Officer Hanrahan referred to Seibert's unwarned statement during the second part of the interrogation when she made a statement at odds with her unwarned confession. App. 70 ("Trice, didn't you tell me that he was supposed to die in his sleep?"); **_cf. Elstad, supra_**, at 316, 105 S.Ct. 1285 (officers did not "exploit the unwarned admission to pressure respondent into waiving his right to remain silent"). Such a tactic may bear on the voluntariness inquiry. **_Cf. Frazier v. Cupp_**, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (fact that police had falsely told a suspect that his accomplice had already confessed was "relevant" to the voluntariness inquiry); **_Moran_**, 475 U.S., at 423–424, 106 S.Ct. 1135 (in discussing police deception, stating that simply withholding information is "relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them"); **_Miranda, supra_**, at 476, 86 S.Ct. 1602.

*Seibert*, 542 U.S. at 628–29 (O'Connor, J. dissenting).

Here, consistent with *Charleston*, and Justice O'Connor's dissent in *Seibert*, the suppression court applied the *Elstad* test to Underkoffler's post-warning statements. *See* Trial Court Opinion, 11/26/22, at 5-6. On appeal, Underkoffler does not claim that the suppression court misapplied *Elstad* (or *DeJesus*, *supra*) to the facts of his case. Thus, any claim that the trooper obtained his post-warning confession in violation of *Elstad* is waived.

Additionally, Underkoffler's claim that the suppression court should have applied Justice Souter's multiprong test from *Seibert* is meritless, in light of our decision in *Charleston*.[9] As such, his second appellate issue affords him no relief.

_____

[9] We note that, "It is beyond the power of a Superior Court panel to overrule a prior decision of the Superior Court, except in circumstances where intervening authority by our Supreme Court calls into question a previous decision of this Court." *Commonwealth v. Pepe*, 897 A.2d 463, 465 (Pa. Super. 2006). Even so, the *Charleston* Court acknowledged that its refusal to apply any test from the *Seibert* plurality is disfavored among the federal appellate courts. A "majority of the Circuit Courts have adopted the position that [Justice] Kennedy's concurring opinion represents the precedent established by *Seibert*." *Charleston*, 16 A.3d at 524.

That federal-appellate-court majority includes the United States Court of Appeals for the Third Circuit. Our circuit court held in *United States v. Naranjo*, 426 F.3d 221 (3d Cir. 2005), that "Justice Kennedy's opinion [in *Seibert*] provides the [test] for resolving the issues raised by two-step interrogations where *Miranda* warnings are not administered until after police obtain an inculpatory statement." *Id.* at 231–32.

Curiously, *Charleston* identifies the Third Circuit's *Naranjo* decision, but it fails to analyze *Naranjo* or its obvious implications for Pennsylvania jurisprudence. This is unfortunate because *Charleston* and *Naranjo* create

*(Footnote Continued Next Page)*

January 18, 2023 Order quashing notice of appeal vacated. Judgment of sentence affirmed.

Judge Dubow joins. Judge Nichols concurs in result.

---

a striking anomaly in our precedents. When two-step interrogations occur, federal courthouses in Pennsylvania are providing higher protections to criminal defendants than their state counterparts. Typically, the opposite is true. *See Commonwealth v. Edmunds*, 586 A.2d 887 (1991) (holding that the state courts may provide greater rights and protections for Pennsylvanians under our charter than the federal courts under theirs).

Moreover, it is surprising that we follow the approach of the four Justices in the *Seibert* minority to validate police action, when a five Justice majority deemed the two-step interrogation unconstitutional, albeit based on varying theories and tests. Respectfully, by applying Justice O'Connor's test, the *Charleston* Court may have missed *Seibert*'s forest for its trees.

*Charleston* invites every defendant in Underkoffler's position to seek federal *habeas corpus* relief, where, under *Naranjo*, they will ultimately receive the protection of *Seibert*. *See, e.g.*, *Charleston v. Gilmore*, 305 F. Supp. 3d 612 (E.D. Pa. 2018) (applying *Seibert* to review Charleston's *habeas corpus* petition, after this Court refused to do so). It therefore seems absurd that we decline to apply some test from the plurality in *Seibert* at suppression hearings in our courts of common pleas and in this Court. By doing so, we are almost daring the federal courts to overturn our state-court convictions.

Thus, this Court *en banc* or the Supreme Court of Pennsylvania may wish to review Underkoffler's claim regarding which test from *Seibert* Pennsylvania should apply.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 11/14/2023